Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THOMAS LIN, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TMC THE METALS COMPANY INC., GERRARD BARON, and CRAIG SHESKY,<br><br>Defendants. | ) | Case No. 2:24-cv-09684-PA-AJR<br><br>**Amended Class Action Complaint**<br><br><u>CLASS ACTION</u><br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Thomas Robinson, and additional named plaintiff Jeffrey Royal (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based

upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TMC the metals company Inc. ("TMC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION[1]

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired TMC securities between May 12, 2023 and March 25, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. TMC is a mining company that seeks to mine the ocean floor. To finance its operations, TMC agreed to receive cash and other consideration in exchange for paying a royalty in one of the fields it plans to mine for cash and other consideration. Defendants recorded the cash and other consideration TMC received (TMC's "get" in the transaction) on its unaudited quarterly financial statements. Defendants told investors that TMC had ***also*** accounted for the royalty liability on its financial statements at the fair value of the royalty interest it transferred (the "give"). Yet contrary to its explicit statement, and in violation of the most simple and obvious accounting principle that companies must record both what they

---

[1] All emphases included herein are added unless otherwise indicated.

receive in a transaction ***and*** what they give the counterparty, Defendants did not record any royalty liability at all on TMC's financial statements. Defendants thus understated TMC's liabilities by almost a third and created $14 million of pure artificial profit, conveniently turning a significant loss into a breakeven quarter. When Defendants revealed the misstatement in their first subsequent annual audited financial statements, TMC's stock price fell by 13%, damaging investors.

3. In February 2023, TMC and its wholly owned subsidiary, Nauru Ocean Resources Inc. ("NORI"), executed a strategic partnership with Low Carbon Royalties Inc. ("LCR") (the "LCR Partnership"). NORI got $5 million and 35% of LCR's shares. In exchange, NORI gave up a 2.0% gross overriding royalty on an existing deep sea mining project area.

4. Basic accounting rules required TMC to account for both what they received through the LCR Partnership and what they agreed to pay to LCR to receive it. And Defendants claimed they had done so. They told investors they had recorded a "royalty liability" on TMC's financial statements. They explained that they had calculated the royalty using the fair value method, and cited a specific accounting provisions they claimed had governed their valuation.

5. Not so. Defendants had not recorded any liability from the LCR Partnership. They had not recorded the "give" at all. By recording just the "get" and ignoring the "give," Defendants both understated liabilities by almost a third and artificially generated $14 million of pure profit. The $14 million in artificial profits came in handy: it allowed TMC to basically break even, recording a quarterly profit of $2,000.

6. In Q2 and Q3 2023 unaudited financial statements, Defendants continued to maintain that TMC had recorded the "give" in the LCR Partnership as a royalty liability. But Defendants were forced to finally come clean on March 25, 2024, after an audit of TMC's 2023 annual financial statements. There, Defendants

admitted that TMC's Q1-Q3 2023 financial statements "should be restated and, accordingly, should no longer be relied upon." Even there, though, Defendants continued to mislead investors. Defendants stated that in restating TMC's financial statement, they had "***re-evaluated*** whether the offsetting entry to the proceeds it received from LCR should be classified as debt or deferred income," thereby implying that they had simply miscategorized the "give" as the wrong kind of liability, when in fact it had failed to recognize the "give" at all.

7. On this news, TMC's stock price fell $0.205 per share, or 13.23%, to close at $1.345 per share on March 26, 2024.

## II. <u>JURISDICTION AND VENUE</u>

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to TMC's most recently filed Quarterly Report with the SEC, as of August 13, 2024, there were 323,993,016 of the Company's common shares outstanding. TMC's securities trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in TMC securities located within the U.S., some of whom undoubtedly reside in this Judicial District. In addition, Plaintiff resides in this Judicial District.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

12. Plaintiff Thomas Robinson, as set forth in the previously filed Certification, acquired TMC common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Plaintiff Jeffrey Royal, as set forth in the attached certification, acquired TMC common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14. Defendant TMC is a Canadian corporation with principal executive offices located at 595 Howe Street, 10th Floor, Vancouver, British Columbia, Canada. TMC's common stock trade in an efficient market on the NASDAQ under the ticker symbol "TMC".

15. Defendant Gerard Barron ("Barron") has served as the Company's Chief Executive Officer at all relevant times. Barron became involved DeepGreen during its formation in 2011 became DeepGreen's Chairman and Chief Executive Officer in 2018. From July 2013 until becoming Chairman and Chief Executive Officer in 2017, Barron served as a strategic advisor to the DeepGreen Board and its shareholders. In 2001, Barron founded Adstream, an advertising technology and services company, and served as the company's Chief Executive Officer until December 2013.

16. Defendant Craig Shesky ("Shesky") served as the Company's Chief Financial Officer since September 2021 and has served as DeepGreen's Head of Financial Markets and Investor Relations since February 2021. From August 2008 until July 2020, Shesky was employed by King Street Capital Management. From July 2006 to July 2008, Mr. Shesky served as an analyst at Morgan Stanley.

17. Defendants Barron and Shesky are collectively referred to herein as the "Individual Defendants".

18. The Individual Defendants possessed the power and authority to

control the contents of TMC's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of TMC's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with TMC, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

19. TMC and the Individual Defendants are collectively referred to herein as "Defendants".

**IV. <u>Significant Non-Parties</u>**

20. Low Carbon Royalties, Inc. ("LCR") is a private corporation formed under the laws of British Columbia to finance low carbon emitting energy production and technology, and minerals and metals required for energy storage and electrification.

**V. <u>Background</u>**

21. Large portions of the ocean seabed are covered with mineable metals, in the form of blackened lumps called polymetallic nodules. Polymetallic nodules contain the four primary battery metals—cobalt, nickel, copper, and manganese—in a single ore.

22. For decades, private companies have sought to develop the technical ability to mine polymetallic nodules.

23. TMC is a deep-sea minerals exploration company that hopes to benefit from the collection, processing, and refining of polymetallic nodules. TMC's field is the seafloor of the Clarion Clipperton Zone ("CCZ") in the Pacific Ocean, approximately 1300 nautical miles southwest of San Diego. The Company's wholly

owned subsidiary, Nauru Ocean Resources Inc. ("NORI") acquired the right from the International Seabed Authority ("ISA") to explore for polymetallic nodules in an area in the CCZ in July 2011 (the "NORI Area").

24. TMC was formed in 2021 as the result of a merger between DeepGreen, a Canadian mining company founded in 2011, and Sustainable Opportunities Acquisition Corp., a Special Purpose Acquisition Company, or SPAC. A SPAC (also known as a blank check company) is a publicly traded company established with the purpose of raising capital to find an appropriate acquisition target, and ultimately use the funds it raises through its IPO to acquire another company. As part of the SPAC process, a SPAC first lists itself on a stock exchange and raises proceeds through an initial public offering. The funds raised in the SPAC's IPO are placed into a trust account. The SPAC then searches for an appropriate acquisition target. If the SPAC cannot find an appropriate target within a specified period of time, it returns the money it raised to its public investors and dissolves. The SPAC formally acquires the private company, and in return, issues SPAC shares to the private company's shareholders.

25. At the time of the merger, shareholders of the SPAC have the opportunity, rather than receiving shares of the merged entity, to have the SPAC repurchase their SPAC shares at the IPO Price. And in TMC's case, far more shareholders than expected elected to redeem their shares, leaving TMC with substantially less capital than it needed to execute its business plan.

26. As a result, TMC was forced to adopt a so-called "capital-light" strategy, avoiding any capital expenditures that were not necessary to support the creation and submission of an application for an exploitation contract. Moreover, though TMC's "capital-light" strategy called for it to "negotiat[e] the settlement of program expenditures with our equity whenever possible," in practice, TMC has only been able to continue as a going concern through extensive borrowings from

credit facilities.

## VI. TMC's Improper Accounting for its Partnership with LCR

27. In February 2023, TMC and its wholly owned subsidiary, NORI, entered into the LCR Partnership. In a press release discussing the terms of the LCR Partnership, TMC stated, in relevant part, that "[t]he Company agreed with LCR to a purchase and sale agreement whereby LCR acquired a 2.0% gross overriding royalty on [TMC's] NORI project area in the Clarion Clipperton Zone of the Pacific Ocean" and, "[i]n consideration . . . the Company received $5,000,000 cash and an initial 35.0% equity interest in LCR." A gross overriding royalty refers to a royalty on gross revenue without any deductions for any costs of revenue.

28. In its form 10-Q filed with the SEC on May 11, 2023, TMC informed investors that:

> The Company has accounted for the investment in LCR in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. When considering the royalty liability instrument as well as the embedded repurchase features, ***management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.***

29. That is, TMC told investors that it recorded a "royalty liability" on its balance sheet. TMC also referenced a specific process it had supposedly undertaken to value the royalty liability.

30. This was pure fantasy. In reality, TMC did not record ***any*** "royalty liability" related to the LCR Partnership. Instead, while recording the assets it received from the LCR Partnership, TMC did not record the liability it assumed as part of the LCR Partnership transaction, resulting in a significant ***gain***.

31. Having failed to account for the royalty at all, management had also not "elected to account … under the fair value option in accordance with ASC 825-10." Thus, the entire process Defendants had supposedly undertaken to record the

royalty liability had never happened.

32. Fair value is "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 825-10-20.

## VII. The LCR Royalty Was a Liability under Straightforward Accounting Principles

33. Statement of Financial Accounting Concepts Number 8 ("CON 8"), Chapter 4, *Elements of Financial Statements*, defines liability as "a present obligation of an entity to transfer an economic benefit" and notes that "a liability has the following two essential characteristics:

> It is a present obligation,
>
> The obligation requires an entity to transfer or otherwise provide economic benefits to others." CON 8, Ch. 4 ¶ E37 – E38.

34. CON 8, Chapter 4 describes features common to all liabilities. These are: a requirement "to pay cash to one or more other identified entities," or "to convey other assets, provide services, or transfer economic benefits or be ready to do so … based on a foundation of legal rights and duties. … Often, obligations incurred in exchange transactions are contractual based on written or oral agreements to pay cash or to provide goods or services to specified or determinable entities on demand at specified or determinable dates or on the occurrence of specified events." CON 8, Ch. 4 ¶ E39 – E40.

35. TMC's obligation to make future royalty payments met all of the above characteristics and features of a liability.

36. Moreover, it is a foundational GAAP assumption that financial statements must record both sides of transactions. Thus, for instance, a company must record both the revenues it earns from sales and the various expenses involved in creating and selling the products and services.

37. In preparing its financial statements for the quarter ended March 31, 2023, the Company disclosed that it had elected to account for the royalty liability using the fair value option in accordance with ASC 825-10, which addresses Financial Instruments. ASC 825 defines a financial lability as "[a] contract that imposes on one entity an obligation to do either of the following: a) deliver cash or another financial instrument to a second party, or b) exchange other financial instruments on potentially unfavorable terms with the second party." ASC 825-10-20.

38. The NORI royalty liability met the definition of a financial liability in accordance with the provisions of ASC 825 upon which the Company relied in electing the fair value option in accounting for the LCR Partnership transaction.

## VIII. A GAAP Restatement Is An Admission that Restated Financial Statements Were Materially False When Published

39. ASC Topic 250, *Accounting Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20. Because GAAP does not apply to immaterial items (ASC 105-10-05-6) a restatement is required only for items deemed to be material.

40. ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

The cumulative effect of the error on periods prior to those presented

> shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.
>
> An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.
>
> Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.
>
> ASC 250-10-45-23.

41. ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item … for each prior period presented" and "the cumulative effect of the change on retained earnings … as of the beginning of the earliest period presented." ASC 250-10-50-7.

42. In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors … concludes that any previously issued financial statements … should no longer be relied upon because of an error in such financial statements."

43. Such disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting profession a "Big R restatement." A Big R restatement occurs when the error is material to the prior period financial statements. The evaluation of the materiality of a misstatement or omission in financial statements is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. Staff Acct. Bull. No. 99, Release No. 99 (Aug. 12, 1999). When an error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer

be relied upon.

44. TMC announced the restatement in a March 25, 2024 Form 8-K.

## IX. Materially False and Misleading Statements Issued During the Class Period

45. The Class Period begins on May 12, 2023, the day after TMC filed, post-market, a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q"). In discussing the Company's strategic partnerships, the Q1 2023 10-Q stated, in relevant part:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. ***When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.***
>
> * * *
>
> The net consideration received of $14 million exceeded NORI exploration contract's carrying value of $0.3 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's Statements of Loss (Income) and Comprehensive Loss(Income).

46. The foregoing statement(s) were false because: (a) TMC had not recorded a "royalty liability" related to Low Carbon Royalties, and therefore (b) TMC had not elected to account for the royalty liability in accordance with ASC 825-10, (c) TMC had not calculated the fair value of the royalty liability, and (d) TMC did not realize a $13.75 million gain on the LCR Partnership transaction.

47. Further, with respect to the Company's disclosure controls and procedures, the Q1 2023 10-Q stated, in relevant part:

> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified

> in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2023.***

48. The foregoing statement was misleading because, a material weakness existed in TMC's internal control over financial reporting, which resulted in TMC's failure to properly account for the LCR Partnership transaction, rendering TMC's disclosure controls and procedures not effective as of March 31, 2023.

49. The Q1 2023 10-Q also included the following in its balance sheet:

| | | | |
|---|---|---|---|
| **LIABILITIES** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 17,544 | 41,614 |
| | | 17,544 | 41,614 |
| **Non-current** | | | |
| Deferred tax liability | | 10,675 | 10,675 |
| Warrants liability | 8 | 1,528 | 983 |
| **TOTAL LIABILITIES** | | **$ 29,747** | **$ 53,272** |

50. The foregoing statement was misleading because TMC's balance sheet did not include the LCR royalty liability.

51. The Q1 2023 10-Q also included the following income statement:

| | Note | Three months ended March 31, 2023 | Three months ended March 31, 2022[(1)] |
|---|---|---|---|
| **Operating expenses** | | | |
| Exploration and evaluation expenses | 7 | $ 7,169 | $ 7,441 |
| General and administrative expenses | | 6,214 | 8,466 |
| **Operating loss** | | **13,383** | **15,907** |
| | | | |
| **Other items** | | | |
| Equity-accounted investment loss | 6 | 219 | — |
| Gain on disposition of asset | 6 | (13,750) | — |
| Interest expense /(income) | | (454) | — |
| Change in fair value of private warrants liability | 8 | 544 | 5,188 |
| Foreign exchange loss | | 29 | 22 |
| Fees and interest on credit facility | 12 | 27 | — |
| | | | |
| **Net Loss (Income) and Comprehensive Loss (Income) for the period** | | **$ (2)** | **$ 21,117** |

52. The foregoing statement was misleading because TMC's claimed gain on disposition of an asset did not take into account the value of the LCR Royalty.

53. On August 14, 2023, TMC filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q"). In discussing the Company's strategic partnerships, the Q2 2023 10-Q stated, in relevant part:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. ***When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.***

* * *

> The net consideration received of $14 million exceeded the NORI Exploration Contract's carrying value of $0.25 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's first quarter of 2023 Statements of Loss (Income) and Comprehensive Loss (Income).

54. The foregoing statements were false because: (a) TMC had not recorded a "royalty liability" related to Low Carbon Royalties, and therefore (b) TMC had not elected to account for the royalty liability in accordance with ASC 825-10, (c) TMC had not calculated the fair value of the royalty liability , and (d) TMC did not realize a $13.75 million gain on the LCR Partnership transaction.

55. Further, with respect to the Company's disclosure controls and procedures, the Q2 2023 10-Q stated, in relevant part:

> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2023.***

56. The foregoing statement was misleading because, a material weakness existed in TMC's internal control over financial reporting, which resulted in TMC's failure to properly account for the LCR Partnership transaction, rendering TMC's disclosure controls and procedures not effective as of March 31, 2023.

57. The Q2 2023 10-Q also included the following in its balance sheet:

| | | | | | |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| **Current** | | | | | |
| Accounts payable and accrued liabilities | | | 18,113 | | 41,614 |
| | | | 18,113 | | 41,614 |
| **Non-current** | | | | | |
| Deferred tax liability | | | 10,675 | | 10,675 |
| Warrants liability | 8 | | 2,314 | | 983 |
| **TOTAL LIABILITIES** | | $ | **31,102** | $ | **53,272** |

58. The foregoing statement was misleading because TMC's balance sheet did not include the LCR royalty liability.

| | | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|---|
| | Note | 2023 | 2022[(1)] | 2023 | 2022[(1)] |
| **Operating expenses** | | | | | |
| Exploration and evaluation expenses | 7 | $ 8,098 | $ 10,241 | $ 15,267 | $ 17,678 |
| General and administrative expenses | | 5,131 | 8,087 | 11,345 | 16,557 |
| **Operating loss** | | **13,229** | **18,328** | **26,612** | **34,235** |
| | | | | | |
| **Other items** | | | | | |
| Equity-accounted investment loss | 6 | 137 | — | 356 | — |
| Gain on disposition of asset | 6 | — | — | (13,750) | — |
| Change in fair value of warrants liability | 8 | 787 | (5,730) | 1,331 | (542) |
| Foreign exchange loss (gain) | | 23 | (22) | 52 | — |
| Interest income | | (319) | (192) | (773) | (192) |
| Fees and interest on credit facility | 11 | 250 | — | 277 | — |
| | | | | | |
| **Net Loss and comprehensive loss for the period** | | $ **14,107** | $ **12,384** | $ **14,105** | $ **33,501** |

59. The Q2 2023 10-Q also included the following in its income statement:

60. The foregoing statement was misleading because TMC's claimed gain on disposition of an asset did not take into account the value of the LCR Royalty.

61. On November 9, 2023, TMC filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2023 (the "Q3 2023 10-Q"). In discussing the Company's strategic partnerships, the Q3 2023 10-Q stated, in relevant part:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. **When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.**
>
> * * *
>
> The net consideration received of $14 million exceeded the NORI Exploration Contract's carrying value of $0.25 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's first quarter of 2023 Statements of Loss (Income) and Comprehensive Loss (Income).

62. The foregoing statements were false because: (a) TMC had not recorded a "royalty liability" related to Low Carbon Royalties, and therefore (b) TMC had not elected to account for the royalty liability in accordance with ASC 825-10, (c) TMC had not calculated the fair value of the royalty liability, and (d) TMC did not realize a $13.75 million gain on the LCR Partnership transaction. Further, with respect to the Company's disclosure controls and procedures, the Q3 2023 10-Q stated, in relevant part:

> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures

> include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2023.***

63. The foregoing statement was misleading because, a material weakness existed in TMC's internal control over financial reporting, which resulted in TMC's failure to properly account for the LCR Partnership transaction, rendering TMC's disclosure controls and procedures not effective as of March 31, 2023.

64. The Q3 2023 10-Q also included the following in its balance sheet:

| | | | |
|---|---|---|---|
| **LIABILITIES** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 19,344 | 41,614 |
| | | 19,344 | 41,614 |
| **Non-current** | | | |
| Deferred tax liability | | 10,675 | 10,675 |
| Warrants liability | 9 | 2,197 | 983 |
| **TOTAL LIABILITIES** | | **$ 32,216** | **$ 53,272** |

65. The foregoing statement was misleading because TMC's balance sheet did not include the LCR royalty liability.

66. The Q3 2023 10-Q also included the following in its income statement:

| | Note | Three months ended September 30, 2023 | Three months ended September 30, 2022 | Nine months ended September 30, 2023 | Nine months ended September 30, 2022 |
|---|---|---|---|---|---|
| **Operating expenses** | | | | | |
| Exploration and evaluation expenses | 7 | $ 7,905 | $ 22,663 | $ 23,172 | $ 40,340 |
| General and administrative expenses | | 4,613 | 5,944 | 15,958 | 22,502 |
| **Operating loss** | | **12,518** | **28,607** | **39,130** | **62,842** |
| | | | | | |
| **Other items** | | | | | |
| Equity-accounted investment loss | 6 | 119 | — | 475 | — |
| Gain on disposition of asset | 6 | — | — | (13,750) | — |
| Change in fair value of warrants liability | 9 | (117) | (350) | 1,214 | (892) |
| Foreign exchange loss (gain) | | 14 | (11) | 66 | (11) |
| Interest income | | (319) | (352) | (1,092) | (544) |
| Fees and interest on credit facility | 12 | 252 | — | 529 | — |
| | | | | | |
| **Net loss and comprehensive loss for the period** | | **$ 12,467** | **$ 27,894** | **$ 26,572** | **$ 61,395** |

67. The foregoing statement was misleading because TMC's claimed gain on disposition of an asset did not take into account the value of the LCR Royalty.

**X. Following An Audit, TMC Is Forced To Admit that It Had Materially Misstated Its Financial Statements**

68. On March 25, 2024, TMC disclosed in a filing on Form 8-K with the SEC that the Company's financial statements for the first three quarters of 2023 "should be restated and, accordingly, should no longer be relied upon." Specifically, TMC stated, in relevant part:

> (a) On March 22, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of the Company and the Board, after discussions with Ernst & Young LLP, the Company's independent registered public accounting firm, and the Company's legal advisors, concluded that the Company's previously issued financial statements (i) for the three months ended March 31, 2023 contained in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2023 as filed with the Securities and Exchange Commission (the "SEC") on May 11, 2023, (ii) the six months ended June 30, 2023 contained in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 as filed with SEC on August 14, 2023 and (iii) the nine months ended September 30, 2023 contained in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 as filed with SEC on November 9, 2023 (the "Previous Financial Statements") should be restated and, accordingly, should no longer be relied upon.
>
> ***
>
> As will be disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2023 expected to be filed with the SEC on March 25, 2024 (the "2023 Annual Report") [. . .], Quarterly Financial Data (Unaudited) Restatement of Previously Issued Financial Statements, to the audited consolidated financial statements included in the 2023 Annual Report when available - and as will be discussed on the Company's conference call for the fourth quarter and full year ended December 31, 2023 to be held on March 25, 2024, the

> right to royalty payments underlying the NORI asset (sale of future revenue) amounting to $14 million was considered as the transfer (sale) of a non-financial asset in the Previous Financial Statements.
>
> In preparing the Previous Financial Statements, the Company derecognized the capitalized exploration contract related to the NORI project amounting to $0.25 million and recorded the remaining value of the non-financial asset received amounting to $13.75 million as a gain on disposition. In connection with the preparation of the financial statements for the year ended December 31, 2023 and a reevaluation of Accounting Standards Codification 470, Debt ("ASC 470"), by the Company, the Company concluded that the sale of future revenue falls within the scope of ASC 470 and, as a result, the Company re-evaluated whether the offsetting entry to the proceeds it received from LCR should be classified as debt or deferred income.
>
> As the transaction with LCR was considered an equity investment rather than a sale transaction, the sale of future revenue will be reclassified as Royalty liability, as per ASC 470, in the Company's 2023 financial statements for the year ended December 31, 2023 to be included in the 2023 Annual Report. Factors that also influenced this reclassification included the Company's continued significant involvement in generating future cash flows from operations and the fact that the earnings process implied in this transaction had not been completed. As a result, the Company will restate the Previous Financial Statements in the 2023 Annual Report.

69. That same day, TMC filed its Annual Report for 2023. It stated, in pertinent part:

> The right to royalty payments underlying the NORI asset (sale of future revenue) amounting to $14 million (Note 9) was considered as the transfer (sale) of a non-financial asset in the Company's previously issued financial statements for the three months ended March 31, 2023, the six months ended June 30, 2023 and the nine months ended September 30, 2023 contained in its Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, June 30, 2023 and September 30, 2023, respectively, filed with the SEC (the "Previous Financial Statements"). In preparing the Previous Financial Statements, the Company derecognized the capitalized exploration contract related to the NORI project amounting to $0.25 million and recorded the remaining value of the non-financial asset received amounting to

$13.75 million as a gain on disposition. In connection with the preparation of the financial statements for the year ended December 31, 2023 and a re-evaluation of ASC 470 by the Company, the Company concluded that the sale of future revenue falls within the scope of ASC 470 and, as a result, the Company re-evaluated whether the offsetting entry to the proceeds it received from Low Carbon Royalties should be classified as debt or deferred income. As the transaction with Low Carbon Royalties was considered an equity investment rather than a sale transaction, the sale of future revenue was reclassified as Royalty Liability, as per ASC 470, in the Company's 2023 financial statements for the year ended December 31, 2023. Factors that also influenced this reclassification included the Company's continued significant involvement in generating future cash flows from operations and the fact that the earnings process implied in this transaction had not been completed. As a result, the Company has restated the Previous Financial Statements.

- This error had no impact on our annual audited financial statements as of December 31, 2023.

- This error had no impact on the consolidated statements of loss and comprehensive loss for the three-month period ended June 30, 2023 and the three month period ended September 30, 2023

- The error and restatement of the 2023 quarterly financial statements does not impact the Company's reported cash position in any of the previously reported periods or as of December 31, 2023.

In the following tables, we have presented a reconciliation of our unaudited condensed consolidated financial information as originally reported in the Previous Financial Statements to the as restated amounts as of and for the three months ended March 31, 2023, six months ended June 30, 2023, and nine months ended September 30, 2023. The restatements will be reflected in the comparative financial statements included in our future filings of our 2024 unaudited condensed consolidated financial statements within our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2024, June 30, 2024 and September 30, 2024, respectively.

The tables below set forth the unaudited condensed consolidated balance sheet information, the unaudited condensed statements of loss and comprehensive loss and the unaudited condensed consolidated statements of cash flows including the amounts as reported,

adjustments and the amounts as restated (in thousands, except per share amounts):

**TMC the metals company Inc.**
**Notes to Consolidated Financial Statements**
**(in thousands of US Dollars, except share, per share amounts and unless otherwise stated)**

**Condensed Consolidated Balance Sheet Information**

| | As at March 31, 2023 | | | As at June 30, 2023 | | | As at September 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated |
| **ASSETS** | | | | | | | | | |
| **Current** | | | | | | | | | |
| Cash | $ 28,390 | $ — | 28,390 | $ 20,006 | $ — | 20,006 | $ 22,548 | — | $ 22,548 |
| Receivables and prepayments | 3,230 | — | 3,230 | 1,637 | — | 1,637 | 5,325 | — | 5,325 |
| | 31,620 | — | 31,620 | 21,643 | — | 21,643 | 27,873 | — | 27,873 |
| **Non-current** | | | | | | | | | |
| Exploration contracts | 42,900 | 250 | 43,150 | 42,900 | 250 | 43,150 | 42,900 | 250 | 43,150 |
| Equipment | 1,997 | — | 1,997 | 1,970 | — | 1,970 | 2,078 | — | 2,078 |
| Right-of-use asset | — | — | — | — | — | — | 6,198 | — | 6,198 |
| Investment | 8,781 | — | 8,781 | 8,644 | — | 8,644 | 8,525 | — | 8,525 |
| | 53,678 | 250 | 53,928 | 53,514 | 250 | 53,764 | 59,701 | 250 | 59,951 |
| **TOTAL ASSETS** | **$ 85,298** | **$ 250** | **$ 85,548** | **$ 75,157** | **$ 250** | **$ 75,407** | **$ 87,574** | **$ 250** | **$ 87,824** |
| **LIABILITIES** | | | | | | | | | |
| **Current** | | | | | | | | | |
| Accounts payable and accrued liabilities | 17,544 | — | 17,544 | 18,113 | — | 18,113 | 19,344 | — | 19,344 |
| | 17,544 | — | 17,544 | 18,113 | — | 18,113 | 19,344 | — | 19,344 |
| **Non-current** | | | | | | | | | |
| Deferred tax liability | 10,675 | — | 10,675 | 10,675 | — | 10,675 | 10,675 | — | 10,675 |
| Royalty Liability | — | 14,000 | 14,000 | — | 14,000 | 14,000 | — | 14,000 | 14,000 |
| Warrants liability | 1,528 | — | 1,528 | 2,314 | — | 2,314 | 2,197 | — | 2,197 |
| **TOTAL LIABILITIES** | **$ 29,747** | **$ 14,000** | **$ 43,747** | **$ 31,102** | **$ 14,000** | **$ 45,102** | **$ 32,216** | **$ 14,000** | **$ 46,216** |
| **EQUITY** | | | | | | | | | |
| Common shares *(unlimited shares, no par value)* | 345,090 | — | 345,090 | 345,775 | — | 345,775 | 434,099 | — | 434,099 |
| Special Shares | — | — | — | — | — | — | — | — | — |
| Additional paid in capital | 186,796 | — | 186,796 | 188,722 | — | 188,722 | 124,168 | — | 124,168 |
| Accumulated other comprehensive loss | (1,216) | — | (1,216) | (1,216) | — | (1,216) | (1,216) | — | (1,216) |
| Deficit | (475,119) | (13,750) | (488,869) | (489,226) | (13,750) | (502,976) | (501,693) | (13,750) | (515,443) |
| **TOTAL EQUITY** | **$ 55,551** | (13,750) | **$ 41,801** | **$ 44,055** | (13,750) | **$ 30,305** | **$ 55,358** | (13,750) | **$ 41,608** |
| **TOTAL LIABILITIES AND EQUITY** | **$ 85,298** | **$ 250** | **$ 85,548** | **$ 75,157** | **$ 250** | **$ 75,407** | **$ 87,574** | **$ 250** | **$ 87,824** |

**TMC the metals company Inc.**
**Notes to Consolidated Financial Statements**
**(in thousands of US Dollars, except share, per share amounts and unless otherwise stated)**

**Condensed Consolidated Statements of Loss and Comprehensive Loss**

| | For three months period ended March 31, 2023 | | | For six months period ended June 30, 2023 | | | For nine months period ended September 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated |
| **Operating expenses** | | | | | | | | | |
| Exploration and evaluation expenses | $ 7,169 | — | $ 7,169 | $ 15,267 | — | $ 15,267 | $ 23,172 | — | $ 23,172 |
| General and administrative expenses | 6,214 | — | 6,214 | 11,345 | — | 11,345 | 15,958 | — | 15,958 |
| **Operating loss** | **13,383** | — | **13,383** | **26,612** | — | **26,612** | **39,130** | — | **39,130** |
| **Other items** | | | | | | | | | |
| Equity-accounted investment loss | 219 | — | 219 | 356 | — | 356 | 475 | — | 475 |
| Gain on disposition of asset | (13,750) | 13,750 | — | (13,750) | 13,750 | — | (13,750) | 13,750 | — |
| Change in fair value of warrants liability | 544 | — | 544 | 1,331 | — | 1,331 | 1,214 | — | 1,214 |
| Foreign exchange loss | 29 | — | 29 | 52 | — | 52 | 66 | — | 66 |
| Interest income | (454) | — | (454) | (773) | — | (773) | (1,092) | — | (1,092) |
| Fees and interest on credit facility | 27 | — | 27 | 277 | — | 277 | 529 | — | 529 |
| **Loss and comprehensive loss for the year, before tax** | **$ (2)** | **$ 13,750** | **$ 13,748** | **$ 14,105** | **$ 13,750** | **$ 27,855** | **$ 26,572** | **$ 13,750** | **$ 40,322** |
| Tax expense | — | — | — | — | — | — | — | — | — |
| **Loss (gain) and comprehensive loss (gain) for the period, after tax** | **$ (2)** | **$ 13,750** | **$ 13,748** | **$ 14,105** | **$ 13,750** | **$ 27,855** | **$ 26,572** | **$ 13,750** | **$ 40,322** |
| **Loss per share - basic and diluted** | **—** | **$ 0.05** | **$ 0.05** | **$ 0.05** | **$ 0.05** | **$ 0.10** | **$ 0.09** | **$ 0.05** | **$ 0.14** |
| **Weighted average number of Common Shares outstanding – basic** | **272,029,603** | **272,029,603** | **272,029,603** | **276,702,050** | **276,702,050** | **276,702,050** | **282,745,892** | **282,745,892** | **282,745,892** |
| **Weighted average number of Common Shares outstanding – diluted** | **300,376,133** | **272,029,603** | **272,029,603** | **276,702,050** | **276,702,050** | **276,702,050** | **282,745,892** | **282,745,892** | **282,745,892** |

TMC the metals company Inc.
Notes to Consolidated Financial Statements
(in thousands of US Dollars, except share, per share amounts and unless otherwise stated)

Condensed Consolidated Statements of Cash Flows

| | For three months period ended March 31, 2023 | | | For six months period ended June 30, 2023 | | | For nine months period ended September 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated |
| **Operating activities** | | | | | | | | | |
| Gain/(Loss) for the period | 2 | (13,750) | (13,748) | (14,105) | (13,750) | (27,855) | (26,572) | (13,750) | (40,322) |
| Items not affecting cash: | | | | | | | | | |
| Amortization | 88 | — | 88 | 175 | — | 175 | 262 | — | 262 |
| Lease expense | — | — | — | — | — | — | 318.00 | — | 318.00 |
| Expenses settled with share-based payments | 1,775 | — | 1,775 | 4,307 | — | 4,307 | 6,839 | — | 6,839 |
| Expenses to be settled with share-based payments | 15 | — | 15 | — | — | — | — | — | — |
| Equity-accounted investment loss | 219 | — | 219 | 356 | — | 356 | 475 | — | 475 |
| Gain on disposition of asset | (13,750) | 13,750 | — | (13,750) | 13,750 | — | (13,750) | 13,750 | — |
| Change in fair value of warrants liability | 545 | — | 545 | 1,331 | — | 1,331 | 1,214 | — | 1,214 |
| Vesting of Allseas Warrant | — | — | — | — | — | — | — | — | — |
| Unrealized foreign exchange movement | (20) | — | (20) | (17) | — | (17) | (24) | — | (24) |
| Changes in working capital: | | — | | — | — | — | — | — | — |
| Receivables and prepayments | (469) | — | (469) | 1,123 | — | 1,123 | (2,364) | — | (2,364) |
| Accounts payable and accrued liabilities | (11,877) | — | (11,877) | (11,277) | — | (11,277) | (10,757) | — | (10,757) |
| **Net cash used in operating activities** | (23,472) | — | (23,472) | (31,857) | — | (31,857) | (44,359) | — | (44,359) |
| **Investing activities** | | | | | | | | | |
| Cash received from investment in Low Carbon Royalties | 5,000 | (5,000) | — | 5,000 | (5,000) | — | 5,000 | (5,000) | — |
| Acquisition of equipment | — | — | — | (75) | — | (75) | (175) | | (175) |
| **Net cash provided by (used in) investing activities** | 5,000 | (5,000) | — | 4,925 | (5,000) | (75) | 4,825 | (5,000) | (175) |
| **Financing activities** | | | | | | | | | |
| Proceeds from Low Carbon Royalties investment | — | 5,000 | 5,000 | — | 5,000 | 5,000 | — | 5,000 | 5,000 |
| Proceeds from Registered Direct Offering | — | — | — | — | — | — | 15,723 | — | 15,723 |
| Expenses paid for Registered Direct Offering | — | — | — | — | — | — | (779) | — | (779) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Proceeds from PIPE financing | — | — | — | — | — | — | — | — | — |
| Expenses paid for PIPE financing | — | — | — | — | — | — | — | — | — |
| Proceeds from employee stock plan | — | — | — | 49 | — | 49 | 49 | — | 49 |
| Proceeds from exercise of stock options | — | — | — | — | — | — | 77 | — | 77 |
| Proceeds from exercise of warrants by Allseas | — | — | — | — | — | — | 116 | — | 116 |
| Proceeds from issuance of shares | — | — | — | 30 | — | 30 | 30 | — | 30 |
| Taxes withheld and paid on share-based compensation | — | — | — | — | — | — | — | — | |
| **Net cash provided by financing activities** | — | 5,000 | 5,000 | 79 | 5,000 | 5,079 | 15,216 | 5,000 | 20,216 |
| **Decrease in cash** | (18,472) | — | (18,472) | (26,853) | — | (26,853) | (24,318) | — | (24,318) |
| **Impact of exchange rate changes on cash** | 20 | — | 20 | 17 | — | 17 | 24 | — | 24 |
| **Cash - beginning of period** | 46,842 | — | 46,842 | 46,842 | — | 46,842 | 46,842 | — | 46,842 |
| **Cash - end of period** | 28,390 | — | 28,390 | 20,006 | — | 20,006 | 22,548 | — | 22,548 |

70. The 2023 Form 10-K further disclosed the following with respect to TMC's controls and procedures:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that ***our disclosure controls and procedures were not effective as of December 31, 2023, as a result of a material weakness in our internal control over financial reporting as described below.***
>
> * * *
>
> As of December 31, 2023, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on this assessment, management concluded that our internal control over financial reporting was not effective as***

> ***management identified a material weakness in our internal control over the accounting for significant non-routine transactions that resulted from the inadequate and untimely involvement of stakeholders and technical advisors with an appropriate level of expertise to account for a non-routine, unusual and complex transaction.*** A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis.
>
> ***This material weakness resulted in errors in the financial statements and related disclosures in our Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, and for the six months ended June 30, 2023 and nine months ended September 30, 2023.*** The cumulative errors in the three periods were made by management in the financial statements as of and for the year ended December 31, 2023 included in this Annual Report, and as such, had no impact on our annual audited financial statements for the year ended December 31, 2023 included in this Annual Report. See Note 22 to the audited consolidated financial statements for the year ended December 31, 2023 included elsewhere in this Annual Report for more information about these changes.

71. On this news, TMC's stock price fell $0.205 per share, or 13.23%, to close at $1.345 per share on March 26, 2024.

72. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## XI. ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

73. In the Form 8-K announcing the Restatement, Defendant made false statements to conceal their culpability.

> In preparing the Previous Financial Statements, the Company derecognized the capitalized exploration contract related to the NORI project amounting to $0.25 million and recorded the remaining value of the non-financial asset received amounting to $13.75 million as a gain on disposition. In connection with the preparation of the financial statements for the year ended December 31, 2023 and a re-evaluation of ASC 470 by the Company, the Company concluded that

> the sale of future revenue falls within the scope of ASC 470 and, as a result, the Company ***re-evaluated whether the offsetting entry to the proceeds it received from Low Carbon Royalties should be classified as debt or deferred income.*** As the transaction with Low Carbon Royalties was considered an equity investment rather than a sale transaction, the sale of future revenue was reclassified as Royalty Liability, as per ASC 470, in the Company's 2023 financial statements for the year ended December 31, 2023.

74. The Form 8-K left investors with the misleading impression that TMC had simply misclassified the royalty liability as debt or deferred income. Merely misclassifying a financial statement entry is far less culpable than entirely failing to record it. Defendants' false statements thus amounted to false exculpatory statements and are probative of scienter.

75. Moreover, failing to record a liability for the royalties due to LCR gave Defendants a striking benefit. Until Q1 2023, TMC had only once recorded a profitable quarter. Because Defendants failed to recognize the "give," they were able to record a gain from disposition of $13.75 million. This was exactly what TMC needed to turn its $13.748 million loss into a $2,000 profit. TMC's statement had the intended effect. The first question on TMC's Q1 2023 earnings call began with the analyst's statement "[c]ongratulations on coming up with a break-even quarter here."

### A. ADDITIONAL ALLEGATIONS IN SUPPORT OF BARRON'S SCIENTER

76. TMC's desperate financial condition and need to raise additional financing gave Defendant Barron motive to commit fraud. Defendant Barron knew throughout the Class Period that TMC, as a result of higher than expected redemptions of SOAC shares during the de-SPAC transaction, and the default of private placement investors, TMC was forced to operate under a "capital-light" strategy that required the company to strictly limit their capital expenditures and to take on additional borrowing to meet their financial obligations.

77. In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Barron's scienter. TMC's own financial statements, that Barron signed, referred to the liability incurred from the Low Carbon Resources investment and calculated the amount of that liability, and yet failed to account for that liability in TMC's financial statements.

78. Defendant Barron's scienter can also be inferred from the small size of the Company. As of December 31, 2023, TMC had 46 employees and contractors.

79. Further supporting Defendant Barron's scienter is the fact that he executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to TMC's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Barron was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

### B. ADDITIONAL ALLEGATIONS IN SUPPORT OF SHESKY'S SCIENTER

80. TMC's desperate financial condition and need to raise additional financing gave Defendant Shesky motive to commit fraud. Defendant Shesky knew throughout the Class Period that TMC that TMC, as a result of higher than expected redemptions of SOAC shares and the default of private placement investors, TMC was forced to operate under a "capital-light" strategy that forced the company to strictly limit their capital expenditures and to take on additional borrowing to meet their financial obligations.

81. In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Shesky's scienter. TMC's own

financial statements, that Shesky signed, referred to the liability incurred from the Low Carbon Resources investment and calculated the amount of that liability, and yet failed to account for that liability in TMC's financial statements.

82. Defendant Shesky's scienter can also be inferred from the small size of the Company. As of December 31, 2023, TMC had 46 employees and contractors.

83. Further supporting Defendant Shesky's scienter is the fact that he executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to TMC's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Barron was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

## XII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

84. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TMC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TMC securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed

Class. Record owners and other members of the Class may be identified from records maintained by TMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

88. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TMC;

  whether the Individual Defendants caused TMC to issue false and misleading financial statements during the Class Period; whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TMC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

26. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

89. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- TMC securities are traded in an efficient market;
- the Company's shares were liquid and traded with an average of 2.2 million shares traded during the Class Period daily;
- the Company traded on the NASDAQ and was covered by eight analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold TMC securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

90. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

91. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah* v. *United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XIII. <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

92. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

93. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

94. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TMC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire TMC securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

95. Pursuant to the above plan, scheme, conspiracy and course of conduct,

each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TMC securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TMC's finances and business prospects.

96. By virtue of their positions at TMC, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

97. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of TMC, the Individual Defendants had knowledge of the details of TMC's internal affairs.

98. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TMC. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TMC's businesses, operations,

future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TMC securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning TMC's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired TMC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

99. During the Class Period, TMC securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TMC securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of TMC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of TMC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

100. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with

their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XIV. COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

102. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

103. During the Class Period, the Individual Defendants participated in the operation and management of TMC, and conducted and participated, directly and indirectly, in the conduct of TMC's business affairs. Because of their senior positions, they knew the adverse non-public information about TMC's misstatement of income and expenses and false financial statements.

104. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TMC's financial condition and results of operations, and to correct promptly any public statements issued by TMC which had become materially false or misleading.

105. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TMC disseminated in the marketplace during the Class Period concerning TMC's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TMC to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of TMC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TMC securities.

106. Each of the Individual Defendants, therefore, acted as a controlling person of TMC. By reason of their senior management positions and/or being directors of TMC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TMC to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of TMC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

107. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TMC.

## XV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XVI. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Laurence M. Rosen, Esq. (SBN 219683)
Jonathan Stern (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff and the Class*