Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS LIN, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TMC THE METALS COMPANY INC., GERRARD BARON, and CRAIG SHESKY,<br><br>Defendants. | Case No. 2:24-cv-09684-PA-AJR<br><br>**Second Amended Class Action Complaint**<br><br><u>CLASS ACTION</u> |

Lead Plaintiff Thomas Robinson, and additional named plaintiff Jeffrey Royal (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based

upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TMC the metals company Inc. ("TMC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION[1]

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired TMC securities between May 12, 2023 and March 25, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. TMC is a mining company that seeks to mine the ocean floor. It formed as the result of a merger between Sustainable Opportunities Acquisition Corp. ("SOAC"), a Special Purpose Acquisition Company ("SPAC") and DeepGreen, a private company. In the first year it was a public company, in 2021, it announced three separate accounting misstatements, all related to a material weakness in internal controls regarding complex or unusual transactions. On May 11, , at the outset of the class period, Defendants announced that TMC had finally remediated this material weakness, in part by hiring accounting staff with sufficient expertise to handle complex or non-routine transactions. That same quarter, TMC announced

[1] All emphases included herein are added unless otherwise indicated.

that it entered into a royalty transaction with Low Carbon Royalties, receiving cash and shares in exchange for paying a royalty in one of the fields it plans to mine. Defendants reported the cash and other consideration TMC received (TMC's "get" in the transaction) on its unaudited quarterly financial statements. Defendants told investors that TMC had ***also*** accounted for the royalty liability on its financial statements at the fair value of the royalty interest it transferred (the "give"). Yet contrary to its explicit statement, and in violation of the most simple and obvious accounting principle that companies must record both what they receive in a transaction ***and*** what they give the counterparty, Defendants did not record any royalty liability at all on TMC's financial statements. Defendants thus understated TMC's liabilities by almost a third and created $14 million of pure artificial gain, conveniently turning a significant loss into a breakeven quarter. Defendants also, despite having claimed to have remediated its prior failures to consult technical experts when accounting for significant or unusual transactions, nevertheless accounted for the LCR royalty transaction without having consulted an expert. When Defendants revealed the misstatement in their first subsequent annual audited financial statements, TMC's stock price fell by 13%, damaging investors.

3. In February 2023, TMC and its wholly owned subsidiary, Nauru Ocean Resources Inc. ("NORI"), executed a strategic partnership with Low Carbon Royalties Inc. ("LCR") (the "LCR Partnership"). NORI got $5 million and 35% of LCR's shares. In exchange, NORI gave up a 2.0% gross overriding royalty on an existing deep-sea mining project area.

4. Basic accounting rules required TMC to account for both what they received through the LCR Partnership and what they agreed to pay to LCR to receive it. Because it created an obligation to pay cash to a third party, the royalty provision of its transaction should have been recorded as a liability on its financial statements. Yet when they filed TMC's Q1 2023 10-Q, Defendants violated

generally accepted accounting principles ("GAAP") by failing to record the royalty provision as a liability. In Q2 and Q3 2023 unaudited financial statements, Defendants continued to maintain that TMC had accounted for the "give" in the LCR Partnership as a royalty liability, without doing so.

5. Defendants were forced to finally come clean on March 25, 2024, after an audit of TMC's 2023 annual financial statements. There, Defendants admitted that TMC's Q1-Q3 2023 financial statements "should be restated and, accordingly, should no longer be relied upon." Even there, though, Defendants continued to mislead investors. Defendants stated that in restating TMC's financial statement, they had "***re-evaluated*** whether the offsetting entry to the proceeds it received from LCR should be classified as debt or deferred income," thereby implying that they had simply miscategorized the "give" as the wrong kind of liability, when in fact it had failed to recognize the "give" at all.

6. Defendants' restatement was particularly important to reasonable investors because it followed instances at each of TMC's predecessor companies in which the companies improperly accounted for non-routine transactions, blamed a lack of accounting staff, and stated that they would remediate the deficiency by hiring accountants. In 2021 and 2022, TMC issued two financial restatements, one related to SOAC, and another related to DeepGreen. Both restatements exposed, in part, a material weakness, namely each entity's inability to properly account for complex or non-routine transactions. In both cases, TMC promised that it would address the deficiencies by hiring accounting staff and devising and enforcing internal procedures that ensured the accounting staff were properly employed in accounting for complex and non-routine transactions. and publicly disclosed, quarter after quarter, that it had a material weakness in internal controls over financial reporting."

7. The LCR Partnership was a "non-routine transaction" because it fell

outside of TMC's normal operations of deep-sea exploration and exploitation of seabed minerals, so these deficiencies would ordinarily have been a concern for investors. But according to Defendants, by Q1 2023, TMC had overcome its shaky financial accounting. In TMC's Q3 2022 10-Q, Defendants stated that it had "evaluated the accounting impacts of all new contracts and arrangements through a detailed analysis against accounting standards and technical interpretations." Even better, Defendants stated that TMC had "hired individuals for the core accounting function with the requisite education, designation, and technical accounting and public company experience." The individual Defendants attested that they had personally evaluated TMC's internal and disclosure controls. Defendants' representation that any material deficiency in accounting for non-routine transaction was in the past would have given reasonable investors comfort that TMC's financial statements were accurately stated. Defendants reported on these financial controls in TMC's 2022 10-K, noting that not enough time had passed to determine whether they had remediated the deficiency. But in the Q1 2023 10-Q, Defendants pronounced the deficiency cured as of March 31, 2023, claiming that TMC's internal controls were now effective. After all this executive attention, TMC appeared uniquely prepared to properly account for complex, non-routine transactions like the LCR royalty.

8. Yet when it restated its financial statements in the 2023 10-K, TMC admitted that "management identified a material weakness … resulting from the inadequate and untimely involvement of stakeholders and technical advisors with an appropriate level of expertise to account for a non-routine, unusual and complex transaction." That was the very problem that had occupied Defendants' personal attention and which they claimed to have solved.

9. On this news, TMC's stock price fell $0.205 per share, or 13.23%, to close at $1.345 per share on March 26, 2024.

10. Defendants told investors that they were spending considerable amounts of TMC management and their own time to address TMC's serious accounting deficiencies relating to non-routine transaction, in part by hiring the necessary qualified personnel In the Q1 2013 10-Q, Defendants stated that these problems were behind TMC. Yet in that very filing, Defendants misrecorded a large transaction that may not have been routine but whose accounting treatment was simple and obvious, because they had not involved the very accountants whose hiring Defendants claimed had addressed the deficiency. When Defendants corrected the misstatement, TMC's stock price fell, damaging investors. Defendants' statements in the financial statements that they had recorded a liability and addressed internal control deficiencies were fraudulent.

## II. <u>JURISDICTION AND VENUE</u>

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to TMC's most recently filed Quarterly Report with the SEC, as of August 13, 2024, there were 323,993,016 of the Company's common shares outstanding. TMC's securities trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in TMC securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

14. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

15. Plaintiff Thomas Robinson, as set forth in the previously filed Certification, acquired TMC common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Plaintiff Jeffrey Royal, as set forth in the attached certification, acquired TMC common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17. Defendant TMC is a Canadian corporation with principal executive offices located at 595 Howe Street, 10th Floor, Vancouver, British Columbia, Canada. TMC's common stock trade in an efficient market on the NASDAQ under the ticker symbol "TMC".

18. Defendant Gerard Barron ("Barron") has served as the Company's Chief Executive Officer at all relevant times. Barron became involved DeepGreen during its formation in 2011, and he became DeepGreen's Chairman and Chief Executive Officer in 2018. From July 2013 until becoming Chairman and Chief Executive Officer in 2017, Barron served as a strategic advisor to the DeepGreen Board and its shareholders. In 2001, Barron founded Adstream, an advertising technology and services company, and served as the company's Chief Executive Officer until December 2013.

19. Defendant Craig Shesky ("Shesky") served as the Company's Chief Financial Officer since September 2021 and has served as DeepGreen's Head of Financial Markets and Investor Relations since February 2021. From August 2008 until July 2020, Shesky was employed by King Street Capital Management. From July 2006 to July 2008, Mr. Shesky served as an analyst at Morgan Stanley.

20. Defendants Barron and Shesky are collectively referred to herein as the "Individual Defendants".

21. The Individual Defendants possessed the power and authority to

control the contents of TMC's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of TMC's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with TMC, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

22. TMC and the Individual Defendants are collectively referred to herein as "Defendants".

## IV. Significant Non-Parties

23. Low Carbon Royalties, Inc. ("LCR") is a private corporation formed under the laws of British Columbia to finance low carbon emitting energy production and technology, and minerals and metals required for energy storage and electrification.

## V. Background

24. Large portions of the ocean seabed are covered with mineable metals, in the form of blackened lumps called polymetallic nodules. Polymetallic nodules contain the four primary battery metals—cobalt, nickel, copper, and manganese—in a single ore.

25. For decades, private companies have sought to develop the technical ability to mine polymetallic nodules.

26. TMC is a deep-sea minerals exploration company that hopes to benefit from the collection, processing, and refining of polymetallic nodules. TMC's field is the seafloor of the Clarion Clipperton Zone ("CCZ") in the Pacific Ocean, approximately 1300 nautical miles southwest of San Diego. The Company's wholly

owned subsidiary, Nauru Ocean Resources Inc. ("NORI") acquired the right from the International Seabed Authority ("ISA") to explore for polymetallic nodules in an area in the CCZ in July 2011 (the "NORI Area").

27. TMC was formed in 2021 as the result of a merger between DeepGreen, a Canadian mining company founded in 2011, and Sustainable Opportunities Acquisition Corp., a Special Purpose Acquisition Company, or SPAC. A SPAC (also known as a blank check company) is a publicly traded company established with the purpose of raising capital to find an appropriate acquisition target, and ultimately use the funds it raises through its IPO to acquire another company. As part of the SPAC process, a SPAC first lists itself on a stock exchange and raises proceeds through an initial public offering. The funds raised in the SPAC's IPO are placed into a trust account. The SPAC then searches for an appropriate acquisition target. If the SPAC cannot find an appropriate target within a specified period of time, it returns the money it raised to its public investors and dissolves. The SPAC formally acquires the private company, and in return, issues SPAC shares to the private company's shareholders.

28. At the time of the merger, shareholders of the SPAC have the opportunity, rather than receiving shares of the merged entity, to have the SPAC repurchase their SPAC shares at the IPO Price. And in TMC's case, far more shareholders than expected elected to redeem their shares, leaving TMC with substantially less capital than it needed to execute its business plan.

29. As a result, TMC was forced to adopt a so-called "capital-light" strategy, avoiding any capital expenditures that were not necessary to support the creation and submission of an application for an exploitation contract. Moreover, though TMC's "capital-light" strategy called for it to "negotiat[e] the settlement of program expenditures with our equity whenever possible," in practice, TMC has only been able to continue as a going concern through extensive borrowings from

credit facilities.

## VI. Defendants Claim they Have Addressed TMC's History of Improperly Accounting for Complex and Non-Routine Transactions

30. Throughout its brief history, TMC repeatedly suffered material weaknesses in its internal controls over financial reporting related to accounting for complex and non-routine transactions. As a result, TMC repeatedly made misstatements in its SEC-filed financial statements. TMC then had to repeatedly restate its financial statements and undertake efforts to remediate those material weaknesses. TMC then repeatedly promised that it had retained qualified accounting staff such that the errors were reasonably likely not to recur.

31. First, since its inception, SOAC improperly classified the warrants that it issued as equity, rather than debt, causing SOAC to overstate its equity and understate its liabilities. It acknowledged this misstatement and corresponding material weakness in its internal controls in an amended annual report filed with the SEC on May 24, 2021. The next day, in its quarterly report for the first quarter of 2021, SOAC specified that:

> [M]anagement identified a material weakness in our internal control over financial reporting related to the ***accounting for a significant and unusual transaction*** related to the warrants we issued in connection with the Initial Public Offering. This material weakness resulted in a material misstatement of our warrant liability, change in fair value of warrant liability, additional paid-in capital and accumulated deficit as of and for the period from December 18, 2019 (inception) through December 31, 2019 and for the year ended December 31, 2020."
>
> [Emphasis added]

32. The next quarter, on August 16, 2021, in its quarterly report for the second quarter of 2021, SOAC specified the remediation measures it had undertaken:

> - We have expanded and improved our review process for complex securities and related accounting standards.

- ***We have engaged additional third-party professionals with additional expertise in complex accounting applications to support preparations of our financial reporting.***

- We have also retained the services of a valuation expert to assist in valuation analysis of the Warrants on a quarterly basis.

[Emphasis added]

33. Then, on November 15, 2021, in its first quarterly report after the merger between SOAC and DeepGreen, TMC announced that DeepGreen had also made misstatements pre-merger: "management discovered misstatements related to the understatement of exploration expense and overstatement of stock option expenses related to the three month period ended March 31, 2021 and six month period ended June 30, 2021." TMC attributed these misstatements "to deficiencies in the design and operation of the financial statement close and reporting controls, including maintaining sufficient written policies and procedures and t***he need to use appropriate technical expertise when accounting for complex or non-routine transactions***." [Emphasis added]. TMC stated that these deficiencies had existed since at least December 31, 2020.

34. In the Q3 2022 10-Q, TMC again stated that it was remedying this deficiency in part by hiring qualified accounting staff, stating that:

- appointed a Chief Financial Officer to oversee the finance and accounting function;

- ***hired individuals for the core accounting function with the requisite education, designation, and technical accounting and public company experience***;

* * *

- ***evaluated the accounting impacts of all new contracts and arrangements through a detailed analysis against accounting standards and technical interpretations***;

- performed a thorough analysis of key issues to be addressed, have prioritized these issues and we are now in the process of addressing these issues;

- began a project to design and implement robust controls over all our key processes and address all key company risks; and
- started adding formality and rigor to our financial reporting process by continuously developing structured roles, policies, processes, procedures and controls.

[Emphasis added]

35. Defendants told investors addressing TMC's poor accounting was a priority. In the Q3 2022 10-Q, they stated that TMC's management had "expended", and would "continue to expend", a s"ubstantial amount of effort and resources" on internal controls. They added that these efforts would be thorough, with management "continually reviewing [the remediation plan] to determine that it is achieving its objectives."

36. According to Defendants, these steps were bearing fruit. In its 2022 10-K, TMC acknowledged that its "newly implemented policies and procedures over key functional areas had not been in operation long enough over the 2022 year to be deemed effective." TMC acknowledged that it had evaluated its internal controls "under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer."

37. Then, on May 11, 2023, TMC claimed, in its quarterly report for the first quarter of 2023, that it had remediated its internal control deficiencies related to, *inter alia*, "maintaining sufficient written policies and procedures and the need to use appropriate technical expertise when accounting for complex or non-routine transactions."

## VII. <u>TMC's Improper Accounting for its Partnership with LCR</u>

38. In February 2023, TMC and its wholly owned subsidiary, NORI, entered into the LCR Partnership. In a press release discussing the terms of the LCR Partnership, TMC stated, in relevant part, that "[t]he Company agreed with LCR to a purchase and sale agreement whereby LCR acquired a 2.0% gross overriding royalty on [TMC's] NORI project area in the Clarion Clipperton Zone of the Pacific

Ocean" and, "[i]n consideration . . . the Company received $5,000,000 cash and an initial 35.0% equity interest in LCR." A gross overriding royalty refers to a royalty on gross revenue without any deductions for any costs of revenue.

39. In its Q1 2023 10-Q filed with the SEC on May 11, 2023, TMC told investors that:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.
>
> On March 21, 2023, Low Carbon Royalties acquired additional gross overriding royalties on natural gas fields in Latin America, increasing its total gross overriding royalty on the existing first license block from 1.56% to 3.13% and acquiring a gross overriding royalty of 1.44% on a new second license block. The royalty acquisitions were financed through the issuance of Low Carbon Royalties common shares to the third-party vendor of such royalties, thereby reducing the Company's ownership in the Partnership to 32% as of March 31, 2023 from 35% as of the Closing Date.
>
> Based on the fair value of the NORI Royalty and the cash received on the Transaction Date, the Company recorded $9 million as investment in Low Carbon Royalties. From the Transaction Date to March 31, 2023, the Company's share of the net loss generated by the Low Carbon Royalties was $0.2 million.

| | Investment |
|---|---|
| Fair value of NORI Royalty | $ 14,000 |
| Cash received | $ (5,000) |
| Cost of Investment on Transaction Date | $ 9,000 |
| Equity-accounted investment loss for the period | (219) |
| **Investment as at March 31, 2023** | **$ 8,781** |

> The net consideration received of $14 million exceeded NORI

> exploration contract's carrying value of $0.3 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's Statements of Loss (Income) and Comprehensive Loss (Income). NORI is in the exploration phase of the project and under the Company's policy, exploration spending is expensed.
>
> * * *
>
> In the first quarter of 2023, we reported a gain of $13.75 million on the disposition of NORI's 2% royalty, reflecting the excess of the consideration received from Low Carbon Royalties of $14 million and NORI exploration contract's carrying value.

40. As TMC admitted in its 2023 10-K filed on March 25, 2024, this accounting treatment violated GAAP:

> The right to royalty payments underlying the NORI asset (sale of future revenue) amounting to $14 million (Note 9) was considered as the transfer (sale) of a non-financial asset in the Company's previously issued financial statements for the three months ended March 31, 2023, the six months ended June 30, 2023 and the nine months ended September 30, 2023 contained in its Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, June 30, 2023 and September 30, 2023, respectively, filed with the SEC (the "Previous Financial Statements"). In preparing the Previous Financial Statements, the Company derecognized the capitalized exploration contract related to the NORI project amounting to $0.25 million and recorded the remaining value of the non-financial asset received amounting to $13.75 million as a gain on disposition. In connection with the preparation of the financial statements for the year ended December 31, 2023 and a re-evaluation of ASC 470 by the Company, the Company concluded that the sale of future revenue falls within the scope of ASC 470 and, as a result, the Company re-evaluated whether the offsetting entry to the proceeds it received from Low Carbon Royalties should be classified as debt or deferred income. As the transaction with Low Carbon Royalties was considered an equity investment rather than a sale transaction, the sale of future revenue was reclassified as Royalty Liability, as per ASC 470, in the Company's 2023 financial statements for the year ended December 31, 2023. Factors that also influenced this reclassification included the Company's continued significant involvement in generating future cash flows from operations and the fact that the earnings process

implied in this transaction had not been completed. As a result, the Company has restated the Previous Financial Statements.

41. This admission reveals that in accounting for the LCR transaction, TMC violated GAAP in two ways. First, TMC originally had treated the LCR transaction as the sale of an asset, rather than an equity investment. Because TMC had "continued significant involvement in generating future cash flows from operations" in NORI and "the earnings process implied in [the] transaction had not been completed," immediate income recognition was not appropriate and ASC 470-10-25-2, by its plain terms, required treatment of the obligation to pay future royalties to LCR as a debt. Second, ASC 470-10-25-2 specifies that if the royalty obligation is not required to be disclosed as debt, the alternative is to disclose it as deferred income, which is also a liability.

42. As a result of these misstatements, TMC stated in its 2023 10-Kt that its internal controls were not effective as of December 31, 2023. Defendants again specified that TMC had a weakness related to "accounting for significant non-routine transaction." This time, the deficiency arose from the "inadequate and untimely involvement of stakeholders and technical advisors with an appropriate level of expertise to account for a non-routine, unusual and complex transaction." On an earnings call that day, Shesky elaborated that "in connection with the preparation of the 2023 year on financial statements and some new information from the technical team of the company's auditors, the company reevaluated accounting for this transaction and concluded that the sale of future revenue falls within the scope of ASC 470 and restated the offsetting entry to the proceeds as it received from low carbon royalties as a royalty liability."

43. In other words, TMC made misstatements in its Q1-Q3 2023 financial statements because it had failed to consult accounting professionals to address non-routine transactions. That is the exact deficiency which had led to TMC's previous misstatements. It is exactly the deficiency Defendants had spent so much time

remediating. And it is the exact deficiency Defendants assured investors they had personally determined had been remediated by hiring the professional accounting team TMC then failed to consult to answer the exact question they were hired to advise on.

## VIII. The LCR Royalty Was a Liability under Straightforward Accounting Principles

44. Plaintiffs retained an expert, Arcady Zaydenverg, to analyze TMC's disclosures in Q1 2023 10-Q related to the LCR transaction and TMC's controls and procedures. Mr. Zaydenverg is a Certified Public Accountant ("CPA") licensed in New York and a Certified Fraud Examiner ("CFE") with almost thirty years of experience in public and private accounting. He has worked as an external and internal accountant with a broad array of companies in various industries. He specializes in providing forensic accounting and litigation advisory services, which often includes analyzing financial statements, notes to financial statements, and other company disclosures to determine the appropriateness of the application of GAAP.

45. According to Mr. Zaydenverg, the LCR transaction represents a sale of future revenue. Such transactions usually involve an entity receiving an up-front payment from an investor in exchange for granting the investor the right to receive a specified percentage or amount of the future revenue stream. GAAP contains established guidance for accounting for sales of future revenues dating back to 1989, when FASB's Emerging Issues Task Force ("EITF") last discussed, and reached a consensus on, Issue No. 88-18, *Sales of Future Revenues*. The main provisions of EITF No 88-18 still exist today as part of the Accounting Standards Codification ("ASC") 470-10.

46. Mr. Zaydenverg noted that ASC 470-10-25 requires a seller of future revenue to evaluate whether to account for the proceeds from the transaction as debt or deferred income. In other words, the seller must determine whether the

transaction is a financing arrangement or a sale. Generally, sales of future revenue are presumed to be financing arrangements, thus requiring recording of debt, rather than deferred income, because the investor is not purchasing goods or services from the entity (i.e., is not the entity's customer), but rather is acquiring a financial interest in the entity's future income streams.[2] Sales of future revenues do not generally represent an entity's ordinary revenue transactions because the proceeds received by the seller are not in exchange for delivering goods or services, but for selling a right to future economic benefits. Therefore, these arrangements do not meet the definition of revenue under ASC 606, which focuses on contracts with customers for goods or services.[3]

47. The guidance in ASC 470-10 ensures that financial statements accurately reflect the transaction's economic substance, preventing companies from immediately booking revenue from what is, in effect, a financing arrangement.

48. The ASC 470-10 guidance sets out various conditions which, if any are met, creates a "rebuttable presumption" that the arrangement should be recorded as a debt:

> <u>Sales of Future Revenues or Various Other Measures of Income</u>
>
> An entity receives cash from an investor and agrees to pay to the investor for a defined period a specified percentage or amount of the revenue or of a measure of income (for example, gross margin, operating income, or pretax income) of a particular product line, business segment, trademark, patent, or contractual right. It is assumed

---

[2] ASC 606 defines a customer as "[a] party that has contracted with an entity to obtain goods or services that are an output of the entity's ordinary activities in exchange for consideration."

[3] ASC 606 defines revenues as "[i]nflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."

that immediate income recognition is not appropriate due to the facts and circumstances. The payment to the investor and the future revenue or income on which the payment is based may be denominated in a foreign currency.

While the classification of the proceeds from the investor as debt or deferred income depends on the specific facts and circumstances of the transaction, **the presence of any one of the following factors independently creates a rebuttable presumption that classification of the proceeds as debt is appropriate**:

a. The transaction does not purport to be a sale (that is, the form of the transaction is debt).

b. **The entity has significant continuing involvement in the generation of the cash flows due the investor (for example, active involvement in the generation of the operating revenues of a product line, subsidiary, or business segment).**

c. The transaction is cancelable by either the entity or the investor through payment of a lump sum or other transfer of assets by the entity.

d. The investor's rate of return is implicitly or explicitly limited by the terms of the transaction.

e. Variations in the entity's revenue or income underlying the transaction have only a trifling impact on the investor's rate of return.

f. The investor has any recourse to the entity relating to the payments due the investor. [Emphasis added.] ASC 470-10-25-1 – 2.

49. The LCR royalty agreement states that "[t]he Company intends to

develop the project"[4] and TMC's disclosures of its business operations make it clear that the Company intended to have significant continued involvement in the in the NORI project. Therefore, according to Mr. Zaydenverg, the above conditions were met, and TMC was required to account for the LCR royalty as debt.[5]

50. Yet TMC failed to account for the LCR transaction as debt, or even as a liability. Instead, TMC recorded the transaction as a disposition of the NORI 2% royalty at a $13.75 million gain calculated as "the excess of the consideration received from Low Carbon Royalties of $14 million and NORI exploration contract's carrying value [of $0.25 million]."[6]

51. Mr. Zaydenverg noted that TMC's disclosures in its Q1 2023 10-Q do not offer sufficient detail to determine the liabilities the Company assumed in the LCR transaction.[7] It is unlikely that an ordinary investor would be able tell from TMC's Q1 2023 financial statements whether TMC recorded the LCR royalty liability on its balance sheet. By stating that "management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10," Defendants imply that the Company has recognized a liability for the royalty. ASC 825-10 provides guidance on the presentation of financial assets and liabilities at fair value on the balance sheet and in the accompanying notes to the financial statements.[8] ASC 825-10-05-5 and 825-10-45-1A – 1B. TMC's disclosure would give a reasonable investor the impression that the Company followed ASC 825-10

---

[4] The Company referred to in the Royalty agreement is Nauru Ocean Resources Inc. ("NORI"), which is a wholly owned subsidiary of TMC.
[5] Transactions accounted for under ASC 470, *Debt*, are outside the scope of ASC 606, *Revenue from Contracts with Customers*. ASC 606-10-15-2.
[6] Q1 2023 10-Q, pages 11, 12 and 25.
[7] TMC had correctly accounted for the assets it received (i.e., TMC's "get") and such accounting was not restated.
[8] ASC 820-10, not ASC 825-10, defines fair value and provides guidance for measurement of fair value.

and recorded the $14.0 million LCR Royalty on its balance sheet as part of its reported $17.5 million balance in "Accounts payable and accrued liabilities," and the notes to the financial statements merely provide the breakdown between the royalty liability (measured at fair value) and the carrying value of other liabilities which were not measured at fair value, a distinction which ASC 825-10 would have required the Company to make, had it recorded the royalty liability on its balance sheet as part of its accounts payable and accrued liabilities.[9]

## IX. The LCR Transaction was Non-Routine for TMC and Required the Use of Experts with Technical Expertise, which TMC Did Not Do

52. The LCR transaction was a non-routine transaction because it was outside of TMC's normal course of business, which is deep sea exploration and exploitation of seabed minerals.

53. In its Q1 2023 10-Q, TMC's management represented it had remediated the previously reported material weakness in TMC's internal control over financial reporting involving accounting for complex or non-routine transactions:

***Remediation of Previously Reported Material Weakness***

---

[9] "An entity shall separately present financial assets and financial liabilities by measurement category and form of financial asset (that is, securities or loans and receivables) in the statement of financial position or the accompanying notes to the financial statements." ASC 825-10-45-1A. "Entities shall report assets and liabilities that are measured at fair value pursuant to the fair value option in this Subtopic in a manner that separates those reported fair values from the carrying amounts of similar assets and liabilities measured using another measurement attribute." ASC 825-10-45-1B. "To accomplish that, an entity shall either: a. Present the aggregate of fair value and non-fair-value amounts in the same line item in the statement of financial position and parenthetically disclose the amount measured at fair value included in the aggregate amount [or] b. Present two separate line items to display the fair value and non-fair-value carrying amounts." ASC 825-10-45-2.

* * *

> In connection with the preparation of DeepGreen's financial statement for the years ended December 31, 2020 and 2019 and three months ended March 31, 2021 that were included in the proxy statement/prospectus filed with the SEC on August 13, 2021, as well as the financial statements for the six months ended June 30, 2021 that were included in our Current Report on Form 8-K, as amended, filed with the SEC on September 15, 2021, ***we identified a material weakness in our internal control over financial reporting*** as of December 31, 2020, March 31, 2021 and June 30, 2021 ***which related to deficiencies in the design and operation of the financial statement close and reporting controls, including maintaining sufficient written policies and procedures and the need to use appropriate technical expertise when accounting for complex or non-routine transactions***. In the process of preparing the Company's third quarter 2021 financial statements, management discovered misstatements related to the understatement of exploration expense and overstatement of stock option expenses related to the three-month period ended March 31, 2021 and six-month period ended June 30, 2021. Management had concluded that this material weakness was due to the fact that, prior to the Business Combination, we were a private company with limited resources. **As part of the review of our disclosure controls and procedures discussed above, management concluded that, as of March 31, 2023, this material weakness was remediated through the operation over time of the previously disclosed remediation items that were implemented by the end of 2022.**[10] [Emphasis added.]

54. According to TMC's Q3 2022 10-Q and 2022 10-K, such remediation activities included the following:

> ● ***appointed a Chief Financial Officer to oversee the finance and accounting function;***

[10] Q1 2023 10-Q, page 32.

> • ***hired individuals for the core accounting function with the requisite education, designation, and technical accounting and public company experience;***
>
> • completed the transition from our outsourced accounting service provider to our in-house finance and accounting function;
>
> • hired external experts to work with our internal team to assist with the design and implementation of robust controls over all our key processes and address all key company risks: the external experts completed their evaluation of our key controls as of end of 2022 and provided their report to management with recommendations for improvements; and
>
> • ***added formality and rigor to our financial reporting process by continuously developing structured roles, policies, processes, procedures and controls.***[11] [Emphasis added.]

55. According to Mr. Zaydenverg, an accounting expert possessing the requisite education, designation, technical accounting skills and public company experience would likely conclude that TMC was required to record the LCR royalty as a liability on its balance sheet because the LCR royalty (a) clearly met the definition of a liability under the FASB Conceptual Framework for Financial Reporting,[12] (b) met the definition of a financial liability under ASC 825-10, which the company stated its management elected to follow in accounting for the royalty

---

[11] 2022 10-K, pages 150 – 151.

[12] Statement of Financial Accounting Concepts Number 8 ("CON 8"), Chapter 4, Elements of Financial Statements, defines liability as "a present obligation of an entity to transfer an economic benefit" and notes that "a liability has the following two essential characteristics:

a. It is a present obligation,

b. The obligation requires an entity to transfer or otherwise provide economic benefits to others." CON 8, Ch. 4 ¶ E37 – E38.

liability,[13] and (c) was required to be recorded as debt under ASC 470, which, as discussed above, contained an example closely mirroring the LCR transaction.[14]

56. Mr. Zaydenverg stated that it is common practice for companies to involve outside experts and a company's auditors when determining accounting for complex or non-routine transactions.

57. The accounting guide of TMC's outside auditor, Ernst & Young ("E&Y") explains why the LCR transaction is a financing transaction through the following guidance:

> **Sales of future revenues**
>
> **A sale of future revenue typically involves an entity receiving an up-front payment from an investor in exchange for granting the investor the right to receive a specified percentage or amount of the future revenue (or other measure of income such as gross margin, operating income or pretax income) of a particular product or service of the entity** (e.g., a drug compound the entity intends to develop) for a defined period. While the transaction entitles the investor to cash flows that vary based on the entity's revenues (or other measure of income), bifurcation of this feature generally is not required because a separate contract with the same terms would be excluded from the scope of ASC 815 based on the exception in ASC 815-10-15-59(d). That exception excludes from derivative accounting non-exchange

[13] ASC 825 defines a financial lability "[a] contract that imposes on one entity an obligation to do either of the following: a) deliver cash or another financial instrument to a second party, or b) exchange other financial instruments on potentially unfavorable terms with the second party." ASC 825-10-20.

[14] At the 1997 AICPA Conference on Current SEC Developments, SEC staff member, Armando Pimentel, said, "The significant continuing involvement criteria appears very difficult to overcome in many cases. That is because the seller of the item generally continues to be involved in the marketing, promotion, or direct generation of the asset's cash flows. For example, if the seller continues to market and promote the asset, in order to preserve or improve the future cash flows to the investor, then the transfer would meet this rebuttable presumption."

traded contracts where settlement is based on a specified volume of sales or service revenues of one of the parties to the contract.

**Whether the up-front payment received from the investor should be classified as debt or deferred income depends on the specific facts and circumstances. ASC 470-10-25-2 provides a number of factors to be considered. Pursuant to that guidance, the presence of any one of the following factors independently creates a rebuttable presumption that debt classification is appropriate:**

- The transaction does not purport to be a sale (that is, the form of the transaction is debt).
- **The entity has significant continuing involvement in the generation of the cash flows due to the investor (for example, active involvement in the generation of the operating revenues of a product line, subsidiary or business segment).**
- The transaction is cancelable by either the entity or the investor through payment of a lump sum or other transfer of assets by the entity.
- The investor's rate of return is implicitly or explicitly limited by the terms of the transaction.
- Variations in the entity's revenue or income underlying the transaction have only a trifling effect on the investor's rate of return.
- The investor has any recourse to the entity relating to the payments due to the investor.[15] [Emphasis added.]

58. The other 3 Big 4 accounting firms all issued similar guidance.[16]

---

[15] E&Y Financial reporting developments, Issuer's accounting for debt and equity financings. Section 2.2.6.8.

[16] See, (a) Deloitte's Roadmap for Issuer's Accounting for Debt, Section 7.2, Sales of Future Revenues, (b) PwC's Financing transactions guide, Section 1.4.5, Sales of future revenues, and (c) KPMG's Debt and equity financing handbook, section 3.7.30.

## X. A GAAP Restatement Is An Admission that Restated Financial Statements Were Materially False When Published

59. ASC Topic 250, *Accounting Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20. Because GAAP does not apply to immaterial items (ASC 105-10-05-6) a restatement is required only for items deemed to be material.

60. ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

> The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.
>
> An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.
>
> Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.
>
> ASC 250-10-45-23.

61. ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item … for each prior period presented" and "the cumulative effect of the change on retained

earnings … as of the beginning of the earliest period presented." ASC 250-10-50-7.

62.

63. TMC announced the restatement in a March 25, 2024 Form 8-K.

## XI. <u>Materially False and Misleading Statements Issued During the Class Period</u>

64. The Class Period begins on May 12, 2023, the day after TMC filed, post-market, a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q"). In discussing the Company's strategic partnerships, the Q1 2023 10-Q stated, in relevant part:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.
>
> On March 21, 2023, Low Carbon Royalties acquired additional gross overriding royalties on natural gas fields in Latin America, increasing its total gross overriding royalty on the existing first license block from 1.56% to 3.13% and acquiring a gross overriding royalty of 1.44% on a new second license block. The royalty acquisitions were financed through the issuance of Low Carbon Royalties common shares to the third-party vendor of such royalties, thereby reducing the Company's ownership in the Partnership to 32% as of March 31, 2023 from 35% as of the Closing Date.
>
> Based on the fair value of the NORI Royalty and the cash received on the Transaction Date, the Company recorded $9 million as investment in Low Carbon Royalties. From the Transaction Date to March 31, 2023, the Company's share of the net loss generated by the Low Carbon Royalties was $0.2 million.
>
> The net consideration received of $14 million exceeded NORI

> exploration contract's carrying value of $0.3 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's Statements of Loss (Income) and Comprehensive Loss (Income). NORI is in the exploration phase of the project and under the Company's policy, exploration spending is expensed.
>
> * * *
>
> In the first quarter of 2023, we reported a gain of $13.75 million on the disposition of NORI's 2% royalty, reflecting the excess of the consideration received fr

| | Investment |
|---|---|
| Fair value of NORI Royalty | $ 14,000 |
| Cash received | $ (5,000) |
| Cost of Investment on Transaction Date | $ 9,000 |
| Equity-accounted investment loss for the period | (219) |
| **Investment as at March 31, 2023** | **$ 8,781** |

> om Low Carbon Royalties of $14 million and NORI exploration contract's carrying value.

65. The foregoing statement was false because: (a) GAAP required TMC to treat the LCR transaction as issuance of debt in exchange for cash and a financing transaction, not as disposition of an asset; (b) whether or not the LCR transaction was an equity investment or disposition of an asset, GAAP required TMC to recognize the fair value of the liability created by TMC's obligation to pay a royalty to LCR in TMC's financial statements; (c) TMC did not "account for the royalty liability under the fair value option in accordance with ASC 825-10" and, in fact, did not account for any part of its transaction with LCR as a liability, at all; (d) TMC did not realize a $13.75 million gain on the LCR transaction.

66. Further, the Q1 2023 10-Q stated, in relevant part:

> As previously disclosed, including in the 2022 Annual Report on Form 10-K, in 2021, we identified material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material

> misstatement of our financial statements will not be prevented or detected on a timely basis. In connection with the preparation of DeepGreen's financial statement for the years ended December 31, 2020 and 2019 and three months ended March 31, 2021 that were included in the proxy statement/prospectus filed with the SEC on August 13, 2021, as well as the financial statements for the six months ended June 30, 2021 that were included in our Current Report on Form 8-K, as amended, filed with the SEC on September 15, 2021, we identified a material weakness in our internal control over financial reporting as of December 31, 2020, March 31, 2021 and June 30, 2021 which related to deficiencies in the design and operation of the financial statement close and reporting controls, including maintaining sufficient written policies and procedures and **the need to use appropriate technical expertise when accounting for complex or non-routine transactions.** In the process of preparing the Company's third quarter 2021 financial statements, management discovered misstatements related to the understatement of exploration expense and overstatement of stock option expenses related to the three-month period ended March 31, 2021 and six-month period ended June 30, 2021. Management had concluded that this material weakness was due to the fact that, prior to the Business Combination, we were a private company with limited resources. As part of the review of our disclosure controls and procedures discussed above, management concluded that, as of March 31, 2023, **this material weakness was remediated through the operation over time of the previously disclosed remediation items that were implemented by the end of 2022.**

67. The "previously disclosed remediation items" Defendants referenced included "hir[ing] individuals for the core accounting function with the requisite education, designation, and technical accounting and public company experience," "evaluat[ing] the accounting impacts of all new contracts and arrangements through a detailed analysis against accounting standards and technical interpretations," and "add[ing] formality and rigor to our financial reporting process by continuously developing structured roles, policies, processes, procedures and controls."

68. The foregoing statement was misleading because TMC had not in reality remedied the material weakness related to using adequate technical expertise

when accounting for complex or non-routine transactions, had not employed individuals for the core accounting function in actually reviewing the LCR transaction, did not evaluate new contracts against accounting standards, and did not develop and apply written procedures to ensure TMC's financial statements were accurate.

69. Further, with respect to the Company's disclosure controls and procedures, the Q1 2023 10-Q stated, in relevant part:

> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2023.***

70. The foregoing statement was misleading because among other things, TMC had not in reality remedied the material weakness related to using adequate technical expertise when accounting for complex or non-routine transactions, had not employed individuals for the core accounting function in actually reviewing the LCR transaction, did not evaluate new contracts against accounting standards, and did not develop and apply written procedures to ensure TMC's financial statements were accurate. As a result, TMC did not have adequate disclosure controls and procedures.

71. On August 14, 2023, TMC filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q"). In discussing the Company's strategic

partnerships, the Q2 2023 10-Q stated, in relevant part:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.
>
> On March 21, 2023, Low Carbon Royalties acquired additional gross overriding royalties on natural gas fields in Latin America, increasing its total gross overriding royalty on the existing first license block from 1.56% to 3.13% and acquiring a gross overriding royalty of 1.44% on a new second license block. The royalty acquisitions were financed through the issuance of Low Carbon Royalties common shares to the third-party vendor of such royalties, thereby reducing the Company's ownership in the Partnership to 32% as of March 31, 2023 from 35% as of the Closing Date.
>
> Based on the fair value of the NORI Royalty and the cash received on the Transaction Date, the Company recorded $9 million as investment in Low Carbon Royalties. From the Transaction Date to March 31, 2023, the Company's share of the net loss generated by the Low Carbon Royalties was $0.2 million.

| | Investment |
|---|---|
| Fair value of NORI Royalty | $ 14,000 |
| Cash received | $ (5,000) |
| Cost of Investment on Transaction Date | $ 9,000 |
| Equity-accounted investment loss for the period | (219) |
| **Investment as at March 31, 2023** | **$ 8,781** |

> The net consideration received of $14 million exceeded NORI exploration contract's carrying value of $0.3 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's Statements of Loss (Income) and Comprehensive Loss (Income). NORI is in the exploration phase of the project and under the Company's policy, exploration spending is expensed.
>
> * * *
>
> In the first half of 2023, we reported a gain of $13.75 million on

> NORI's contribution in February 2023 of a 2% gross overriding royalty on the NORI project area to Low Carbon Royalties, reflecting the excess of the consideration received from Low Carbon Royalties of $14 million and NORI's exploration contract carrying value.

72. The foregoing statement was false because: (a) GAAP required TMC to treat the LCR transaction as an equity investment, not disposition of an asset; (b) whether or not the LCR transaction was an equity investment or disposition of an asset, GAAP required TMC to disclose the fair market value of the liability created by TMC's obligation to pay a royalty to LCR; (c) TMC did not "account for the royalty liability under the fair value option in accordance with ASC 825-10" and in fact did not account for any part of its transaction with LCR as a liability at all; (d) TMC did not involve technical experts in its accounting for the LCR transaction, in contravention of its stated policies.

73. Further, with respect to the Company's disclosure controls and procedures, the Q2 2023 10-Q stated, in relevant part:

> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2023.***

74. The foregoing statement was misleading because among other things, TMC had not in reality remedied the material weakness related to using adequate technical expertise when accounting for complex or non-routine transactions, had not employed individuals for the core accounting function in actually reviewing the

LCR transaction, did not evaluate new contracts against accounting standards, and did not develop and apply written procedures to ensure TMC's financial statements were accurate. As a result, TMC did not have adequate disclosure controls and procedures.

75. On November 9, 2023, TMC filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2023 (the "Q3 2023 10-Q"). In discussing the Company's strategic partnerships, the Q3 2023 10-Q stated, in relevant part:

> The Company has accounted for the investment in Low Carbon Royalties in accordance with ASC 323-10 and has thus applied the equity method of accounting to this investment. When considering the royalty liability instrument as well as the embedded repurchase features, management has elected to account for the royalty liability under the fair value option in accordance with ASC 825-10.
>
> On March 21, 2023, Low Carbon Royalties acquired additional gross overriding royalties on natural gas fields in Latin America, increasing its total gross overriding royalty on the existing first license block from 1.56% to 3.13% and acquiring a gross overriding royalty of 1.44% on a new second license block. The royalty acquisitions were financed through the issuance of Low Carbon Royalties common shares to the third-party vendor of such royalties, thereby reducing the Company's ownership in the Partnership to 32% as of March 31, 2023 from 35% as of the Closing Date.
>
> Based on the fair value of the NORI Royalty and the cash received on the Transaction Date, the Company recorded $9 million as investment in Low Carbon Royalties. From the Transaction Date to March 31, 2023, the Company's share of the net loss generated by the Low Carbon Royalties was $0.2 million.

| | Investment |
|---|---|
| Fair value of NORI Royalty | $ 14,000 |
| Cash received | $ (5,000) |
| Cost of Investment on Transaction Date | $ 9,000 |
| Equity-accounted investment loss for the period | (219) |
| **Investment as at March 31, 2023** | **$ 8,781** |

> The net consideration received of $14 million exceeded NORI exploration contract's carrying value of $0.3 million, resulting in a gain on disposition of asset of $13.75 million recorded in the Company's Statements of Loss (Income) and Comprehensive Loss (Income). NORI is in the exploration phase of the project and under the Company's policy, exploration spending is expensed.
>
> * * *
>
> In the first nine months of 2023, we reported a gain of $13.75 million on NORI's contribution in February 2023 of a 2% gross overriding royalty on the NORI project area to Low Carbon Royalties, reflecting the excess of the consideration received from Low Carbon Royalties of $14 million and NORI's exploration contract carrying value.

76. The foregoing statement was false because: (a) GAAP required TMC to treat the LCR transaction as an equity investment, not disposition of an asset; (b) whether or not the LCR transaction was an equity investment or disposition of an asset, GAAP required TMC to disclose the fair market value of the liability created by TMC's obligation to pay a royalty to LCR; (c) TMC did not "account for the royalty liability under the fair value option in accordance with ASC 825-10" and in fact did not account for any part of its transaction with LCR as a liability at all; (d) TMC did not involve technical experts in its accounting for the LCR transaction, in contravention of its stated policies.

77. Further, with respect to the Company's disclosure controls and procedures, the Q3 2023 10-Q stated, in relevant part:

> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in

> our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2023.***

78. The foregoing statement was misleading because among other things, TMC had not in reality remedied the material weakness related to using adequate technical expertise when accounting for complex or non-routine transactions, had not employed individuals for the core accounting function in actually reviewing the LCR transaction, did not evaluate new contracts against accounting standards, and did not develop and apply written procedures to ensure TMC's financial statements were accurate. As a result, TMC did not have adequate disclosure controls and procedures.

## XII. Following An Audit, TMC Is Forced To Admit that It Had Materially Misstated Its Financial Statements

79. On March 25, 2024, TMC disclosed in a filing on Form 8-K with the SEC that the Company's financial statements for the first three quarters of 2023 "should be restated and, accordingly, should no longer be relied upon." Specifically, TMC stated, in relevant part:

> (a) On March 22, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of the Company and the Board, after discussions with Ernst & Young LLP, the Company's independent registered public accounting firm, and the Company's legal advisors, concluded that the Company's previously issued financial statements (i) for the three months ended March 31, 2023 contained in its Quarterly Report on Form 10-Q for the quarter

ended March 31, 2023 as filed with the Securities and Exchange Commission (the "SEC") on May 11, 2023, (ii) the six months ended June 30, 2023 contained in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 as filed with SEC on August 14, 2023 and (iii) the nine months ended September 30, 2023 contained in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 as filed with SEC on November 9, 2023 (the "Previous Financial Statements") should be restated and, accordingly, should no longer be relied upon.

***

As will be disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2023 expected to be filed with the SEC on March 25, 2024 (the "2023 Annual Report") [. . .], Quarterly Financial Data (Unaudited) Restatement of Previously Issued Financial Statements, to the audited consolidated financial statements included in the 2023 Annual Report when available - and as will be discussed on the Company's conference call for the fourth quarter and full year ended December 31, 2023 to be held on March 25, 2024, the right to royalty payments underlying the NORI asset (sale of future revenue) amounting to $14 million was considered as the transfer (sale) of a non-financial asset in the Previous Financial Statements.

In preparing the Previous Financial Statements, the Company derecognized the capitalized exploration contract related to the NORI project amounting to $0.25 million and recorded the remaining value of the non-financial asset received amounting to $13.75 million as a gain on disposition. In connection with the preparation of the financial statements for the year ended December 31, 2023 and a reevaluation of Accounting Standards Codification 470, Debt ("ASC 470"), by the Company, the Company concluded that the sale of future revenue falls within the scope of ASC 470 and, as a result, the Company re-evaluated whether the offsetting entry to the proceeds it received from LCR should be classified as debt or deferred income.

As the transaction with LCR was considered an equity investment rather than a sale transaction, the sale of future revenue will be reclassified as Royalty liability, as per ASC 470, in the Company's 2023 financial statements for the year ended December 31, 2023 to be included in the 2023 Annual Report. Factors that also influenced this

> reclassification included the Company's continued significant involvement in generating future cash flows from operations and the fact that the earnings process implied in this transaction had not been completed. As a result, the Company will restate the Previous Financial Statements in the 2023 Annual Report.

80. That same day, TMC filed its Annual Report for 2023. It stated, in pertinent part:

> The right to royalty payments underlying the NORI asset (sale of future revenue) amounting to $14 million (Note 9) was considered as the transfer (sale) of a non-financial asset in the Company's previously issued financial statements for the three months ended March 31, 2023, the six months ended June 30, 2023 and the nine months ended September 30, 2023 contained in its Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, June 30, 2023 and September 30, 2023, respectively, filed with the SEC (the "Previous Financial Statements"). In preparing the Previous Financial Statements, the Company derecognized the capitalized exploration contract related to the NORI project amounting to $0.25 million and recorded the remaining value of the non-financial asset received amounting to $13.75 million as a gain on disposition. In connection with the preparation of the financial statements for the year ended December 31, 2023 and a re-evaluation of ASC 470 by the Company, the Company concluded that the sale of future revenue falls within the scope of ASC 470 and, as a result, the Company re-evaluated whether the offsetting entry to the proceeds it received from Low Carbon Royalties should be classified as debt or deferred income. As the transaction with Low Carbon Royalties was considered an equity investment rather than a sale transaction, the sale of future revenue was reclassified as Royalty Liability, as per ASC 470, in the Company's 2023 financial statements for the year ended December 31, 2023. Factors that also influenced this reclassification included the Company's continued significant involvement in generating future cash flows from operations and the fact that the earnings process implied in this transaction had not been completed. As a result, the Company has restated the Previous Financial Statements.
>
> - This error had no impact on our annual audited financial statements as of December 31, 2023.
>
> - This error had no impact on the consolidated statements of loss and

comprehensive loss for the three-month period ended June 30, 2023 and the three month period ended September 30, 2023

- The error and restatement of the 2023 quarterly financial statements does not impact the Company's reported cash position in any of the previously reported periods or as of December 31, 2023.

In the following tables, we have presented a reconciliation of our unaudited condensed consolidated financial information as originally reported in the Previous Financial Statements to the as restated amounts as of and for the three months ended March 31, 2023, six months ended June 30, 2023, and nine months ended September 30, 2023. The restatements will be reflected in the comparative financial statements included in our future filings of our 2024 unaudited condensed consolidated financial statements within our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2024, June 30, 2024 and September 30, 2024, respectively.

The tables below set forth the unaudited condensed consolidated balance sheet information, the unaudited condensed statements of loss and comprehensive loss and the unaudited condensed consolidated statements of cash flows including the amounts as reported, adjustments and the amounts as restated (in thousands, except per share amounts):

**TMC the metals company Inc.**
**Notes to Consolidated Financial Statements**
**(in thousands of US Dollars, except share, per share amounts and unless otherwise stated)**

**Condensed Consolidated Balance Sheet Information**

| | As at March 31, 2023 | | | As at June 30, 2023 | | | As at September 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated |
| **ASSETS** | | | | | | | | | |
| **Current** | | | | | | | | | |
| Cash | $ 28,390 | $ — | 28,390 | $ 20,006 | $ — | 20,006 | $ 22,548 | — | $ 22,548 |
| Receivables and prepayments | 3,230 | — | 3,230 | 1,637 | — | 1,637 | 5,325 | — | 5,325 |
| | 31,620 | — | 31,620 | 21,643 | — | 21,643 | 27,873 | — | 27,873 |
| **Non-current** | | | | | | | | | |
| Exploration contracts | 42,900 | 250 | 43,150 | 42,900 | 250 | 43,150 | 42,900 | 250 | 43,150 |
| Equipment | 1,997 | — | 1,997 | 1,970 | — | 1,970 | 2,078 | — | 2,078 |
| Right-of-use asset | — | — | — | — | — | — | 6,198 | — | 6,198 |
| Investment | 8,781 | — | 8,781 | 8,644 | — | 8,644 | 8,525 | — | 8,525 |
| | 53,678 | 250 | 53,928 | 53,514 | 250 | 53,764 | 59,701 | 250 | 59,951 |
| **TOTAL ASSETS** | $ 85,298 | $ 250 | $ 85,548 | $ 75,157 | $ 250 | $ 75,407 | $ 87,574 | $ 250 | $ 87,824 |
| **LIABILITIES** | | | | | | | | | |
| **Current** | | | | | | | | | |
| Accounts payable and accrued liabilities | 17,544 | — | 17,544 | 18,113 | — | 18,113 | 19,344 | — | 19,344 |
| | 17,544 | — | 17,544 | 18,113 | — | 18,113 | 19,344 | — | 19,344 |
| **Non-current** | | | | | | | | | |
| Deferred tax liability | 10,675 | — | 10,675 | 10,675 | — | 10,675 | 10,675 | — | 10,675 |
| Royalty Liability | — | 14,000 | 14,000 | — | 14,000 | 14,000 | — | 14,000 | 14,000 |
| Warrants liability | 1,528 | — | 1,528 | 2,314 | — | 2,314 | 2,197 | — | 2,197 |
| **TOTAL LIABILITIES** | $ 29,747 | $ 14,000 | $ 43,747 | $ 31,102 | $ 14,000 | $ 45,102 | $ 32,216 | $ 14,000 | $ 46,216 |
| **EQUITY** | | | | | | | | | |
| Common shares *(unlimited shares, no par value)* | 345,090 | — | 345,090 | 345,775 | — | 345,775 | 434,099 | — | 434,099 |
| Special Shares | — | — | — | — | — | — | — | — | — |
| Additional paid in capital | 186,796 | — | 186,796 | 188,722 | — | 188,722 | 124,168 | — | 124,168 |
| Accumulated other comprehensive loss | (1,216) | — | (1,216) | (1,216) | — | (1,216) | (1,216) | — | (1,216) |
| Deficit | (475,119) | (13,750) | (488,869) | (489,226) | (13,750) | (502,976) | (501,693) | (13,750) | (515,443) |
| **TOTAL EQUITY** | $ 55,551 | (13,750) | $ 41,801 | $ 44,055 | (13,750) | $ 30,305 | $ 55,358 | (13,750) | $ 41,608 |
| **TOTAL LIABILITIES AND EQUITY** | $ 85,298 | $ 250 | $ 85,548 | $ 75,157 | $ 250 | $ 75,407 | $ 87,574 | $ 250 | $ 87,824 |

**TMC the metals company Inc.**
**Notes to Consolidated Financial Statements**
**(in thousands of US Dollars, except share, per share amounts and unless otherwise stated)**

**Condensed Consolidated Statements of Loss and Comprehensive Loss**

| | For three months period ended March 31, 2023 | | | For six months period ended June 30, 2023 | | | For nine months period ended September 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated |
| **Operating expenses** | | | | | | | | | |
| Exploration and evaluation expenses | $ 7,169 | — | $ 7,169 | $ 15,267 | — | $ 15,267 | $ 23,172 | — | $ 23,172 |
| General and administrative expenses | 6,214 | — | 6,214 | 11,345 | — | 11,345 | 15,958 | — | 15,958 |
| **Operating loss** | **13,383** | **—** | **13,383** | **26,612** | **—** | **26,612** | **39,130** | **—** | **39,130** |
| **Other items** | | | | | | | | | |
| Equity-accounted investment loss | 219 | — | 219 | 356 | — | 356 | 475 | — | 475 |
| Gain on disposition of asset | (13,750) | 13,750 | — | (13,750) | 13,750 | — | (13,750) | 13,750 | — |
| Change in fair value of warrants liability | 544 | — | 544 | 1,331 | — | 1,331 | 1,214 | — | 1,214 |
| Foreign exchange loss | 29 | — | 29 | 52 | — | 52 | 66 | — | 66 |
| Interest income | (454) | — | (454) | (773) | — | (773) | (1,092) | — | (1,092) |
| Fees and interest on credit facility | 27 | — | 27 | 277 | — | 277 | 529 | — | 529 |
| **Loss and comprehensive loss for the year, before tax** | **$ (2)** | **$ 13,750** | **$ 13,748** | **$ 14,105** | **$ 13,750** | **$ 27,855** | **$ 26,572** | **$ 13,750** | **$ 40,322** |
| Tax expense | — | — | — | — | — | — | — | — | — |
| **Loss (gain) and comprehensive loss (gain) for the period, after tax** | **$ (2)** | **$ 13,750** | **$ 13,748** | **$ 14,105** | **$ 13,750** | **$ 27,855** | **$ 26,572** | **$ 13,750** | **$ 40,322** |
| **Loss per share - basic and diluted** | **—** | **$ 0.05** | **$ 0.05** | **$ 0.05** | **$ 0.05** | **$ 0.10** | **$ 0.09** | **$ 0.05** | **$ 0.14** |
| **Weighted average number of Common Shares outstanding – basic** | **272,029,603** | **272,029,603** | **272,029,603** | **276,702,050** | **276,702,050** | **276,702,050** | **282,745,892** | **282,745,892** | **282,745,892** |
| **Weighted average number of Common Shares outstanding – diluted** | **300,376,133** | **272,029,603** | **272,029,603** | **276,702,050** | **276,702,050** | **276,702,050** | **282,745,892** | **282,745,892** | **282,745,892** |

**TMC the metals company Inc.**
**Notes to Consolidated Financial Statements**
**(in thousands of US Dollars, except share, per share amounts and unless otherwise stated)**

**Condensed Consolidated Statements of Cash Flows**

| | For three months period ended March 31, 2023 | | | For six months period ended June 30, 2023 | | | For nine months period ended September 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated | As Previously Reported | Restatement Adjustments | As Restated |
| **Operating activities** | | | | | | | | | |
| Gain/(Loss) for the period | 2 | (13,750) | (13,748) | (14,105) | (13,750) | (27,855) | (26,572) | (13,750) | (40,322) |
| Items not affecting cash: | | | | | | | | | |
| Amortization | 88 | — | 88 | 175 | — | 175 | 262 | — | 262 |
| Lease expense | — | — | — | — | — | — | 318.00 | — | 318.00 |
| Expenses settled with share-based payments | 1,775 | — | 1,775 | 4,307 | — | 4,307 | 6,839 | — | 6,839 |
| Expenses to be settled with share-based payments | 15 | — | 15 | — | — | — | — | — | — |
| Equity-accounted investment loss | 219 | — | 219 | 356 | — | 356 | 475 | — | 475 |
| Gain on disposition of asset | (13,750) | 13,750 | — | (13,750) | 13,750 | — | (13,750) | 13,750 | — |
| Change in fair value of warrants liability | 545 | — | 545 | 1,331 | — | 1,331 | 1,214 | — | 1,214 |
| Vesting of Allseas Warrant | — | — | — | — | — | — | — | — | — |
| Unrealized foreign exchange movement | (20) | — | (20) | (17) | — | (17) | (24) | — | (24) |
| Changes in working capital: | | — | | — | — | — | — | — | — |
| Receivables and prepayments | (469) | — | (469) | 1,123 | — | 1,123 | (2,364) | — | (2,364) |
| Accounts payable and accrued liabilities | (11,877) | — | (11,877) | (11,277) | — | (11,277) | (10,757) | — | (10,757) |
| **Net cash used in operating activities** | (23,472) | — | (23,472) | (31,857) | — | (31,857) | (44,359) | — | (44,359) |
| **Investing activities** | | | | | | | | | |
| Cash received from investment in Low Carbon Royalties | 5,000 | (5,000) | — | 5,000 | (5,000) | — | 5,000 | (5,000) | — |
| Acquisition of equipment | — | — | — | (75) | — | (75) | (175) | | (175) |
| **Net cash provided by (used in) investing activities** | 5,000 | (5,000) | — | 4,925 | (5,000) | (75) | 4,825 | (5,000) | (175) |
| **Financing activities** | | | | | | | | | |
| Proceeds from Low Carbon Royalties investment | — | 5,000 | 5,000 | — | 5,000 | 5,000 | — | 5,000 | 5,000 |
| Proceeds from Registered Direct Offering | — | — | — | — | — | — | 15,723 | — | 15,723 |
| Expenses paid for Registered Direct Offering | — | — | — | — | — | — | (779) | — | (779) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Proceeds from PIPE financing | — | — | — | — | — | — | — | — | — |
| Expenses paid for PIPE financing | — | — | — | — | — | — | — | — | — |
| Proceeds from employee stock plan | — | — | — | 49 | — | 49 | 49 | — | 49 |
| Proceeds from exercise of stock options | — | — | — | — | — | — | 77 | — | 77 |
| Proceeds from exercise of warrants by Allseas | — | — | — | — | — | — | 116 | — | 116 |
| Proceeds from issuance of shares | — | — | — | 30 | — | 30 | 30 | — | 30 |
| Taxes withheld and paid on share-based compensation | — | — | — | — | — | — | — | — | |
| **Net cash provided by financing activities** | — | 5,000 | 5,000 | 79 | 5,000 | 5,079 | 15,216 | 5,000 | 20,216 |
| **Decrease in cash** | (18,472) | — | (18,472) | (26,853) | — | (26,853) | (24,318) | — | (24,318) |
| **Impact of exchange rate changes on cash** | 20 | — | 20 | 17 | — | 17 | 24 | — | 24 |
| **Cash - beginning of period** | 46,842 | — | 46,842 | 46,842 | — | 46,842 | 46,842 | — | 46,842 |
| **Cash - end of period** | 28,390 | — | 28,390 | 20,006 | — | 20,006 | 22,548 | — | 22,548 |

81. The 2023 Form 10-K further disclosed the following with respect to TMC's controls and procedures:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that ***our disclosure controls and procedures were not effective as of December 31, 2023, as a result of a material weakness in our internal control over financial reporting as described below.***
>
> * * *
>
> As of December 31, 2023, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on this assessment, management concluded that our internal control over financial reporting was not effective as***

> ***management identified a material weakness in our internal control over the accounting for significant non-routine transactions that resulted from the inadequate and untimely involvement of stakeholders and technical advisors with an appropriate level of expertise to account for a non-routine, unusual and complex transaction.*** A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis.
>
> ***This material weakness resulted in errors in the financial statements and related disclosures in our Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, and for the six months ended June 30, 2023 and nine months ended September 30, 2023.*** The cumulative errors in the three periods were made by management in the financial statements as of and for the year ended December 31, 2023 included in this Annual Report, and as such, had no impact on our annual audited financial statements for the year ended December 31, 2023 included in this Annual Report. See Note 22 to the audited consolidated financial statements for the year ended December 31, 2023 included elsewhere in this Annual Report for more information about these changes.

82. On this news, TMC's stock price fell $0.205 per share, or 13.23%, to close at $1.345 per share on March 26, 2024.

83. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## XIII. ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

### A. ADDITIONAL ALLEGATIONS IN SUPPORT OF BARRON'S SCIENTER

84. TMC's desperate financial condition and need to raise additional financing gave Defendant Barron motive to commit fraud. Defendant Barron knew throughout the Class Period that TMC, as a result of higher than expected redemptions of SOAC shares during the de-SPAC transaction, and the default of private placement investors, TMC was forced to operate under a "capital-light"

strategy that required the company to strictly limit their capital expenditures and to take on additional borrowing to meet their financial obligations.

85. In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Barron's scienter. TMC's own financial statements, that Barron signed, referred to the liability incurred from the Low Carbon Resources investment and calculated the amount of that liability, and yet failed to account for that liability in TMC's financial statements.

86. Defendant Barron's scienter can also be inferred from the small size of the Company. As of December 31, 2023, TMC had 46 employees and contractors.

87. Further supporting Defendant Barron's scienter is the fact that he executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to TMC's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Barron was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

88. Barron personally evaluated TMC's internal controls over financial reporting as of December 31, 2022.

89. In addition, because the LCR transaction was a significant and non-routine transaction, TMC's policies required the company to engage individuals with technical expertise to determine the appropriate accounting treatment of the LCR transaction. Yet, despite this, in direct contravention of their policies, Barron did not retain advisors with technical expertise in financial transactions like the LCR transaction.

### B. ADDITIONAL ALLEGATIONS IN SUPPORT OF SHESKY'S SCIENTER

90. TMC's desperate financial condition and need to raise additional financing gave Defendant Shesky motive to commit fraud. Defendant Shesky knew throughout the Class Period that TMC that TMC, as a result of higher than expected redemptions of SOAC shares and the default of private placement investors, TMC was forced to operate under a "capital-light" strategy that forced the company to strictly limit their capital expenditures and to take on additional borrowing to meet their financial obligations.

91. In addition, the simplicity and obviousness of the accounting standards at issue support a strong inference of Defendant Shesky's scienter. TMC's own financial statements, that Shesky signed, referred to the liability incurred from the Low Carbon Resources investment and calculated the amount of that liability, and yet failed to account for that liability in TMC's financial statements.

92. Defendant Shesky's scienter can also be inferred from the small size of the Company. As of December 31, 2023, TMC had 46 employees and contractors.

93. Further supporting Defendant Shesky's scienter is the fact that he executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to TMC's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendant Barron was "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures."

94. Shesky personally evaluated TMC's internal controls over financial reporting as of December 31, 2022.

95. In addition, because the LCR transaction was a significant and non-

routine transaction, TMC's policies required the company to engage individuals with technical expertise to determine the appropriate accounting treatment of the LCR transaction. Yet, despite this, in direct contravention of their policies and customary practice, Shesky did not retain advisors with technical expertise in financial transactions like the LCR transaction.

## XIV. PLAINTIFFS' CLASS ACTION ALLEGATIONS

96. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TMC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

97. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TMC securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

98. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

99. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

100. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TMC;

  whether the Individual Defendants caused TMC to issue false and misleading financial statements during the Class Period; whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TMC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

101. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

102. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose

material facts during the Class Period;

- the omissions and misrepresentations were material;
- TMC securities are traded in an efficient market;
- the Company's shares were liquid and traded with an average of 2.2 million shares traded during the Class Period daily;
- the Company traded on the NASDAQ and was covered by eight analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold TMC securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

103. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

104. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah* v. *United States,* 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XV. COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

105. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

106. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder by the SEC.

107. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TMC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire TMC securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

108. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TMC securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TMC's finances and business prospects.

109. By virtue of their positions at TMC, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth

in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

110. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of TMC, the Individual Defendants had knowledge of the details of TMC's internal affairs.

111. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TMC. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TMC's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TMC securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning TMC's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired TMC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

112. During the Class Period, TMC securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TMC securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of TMC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of TMC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

113. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

114. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XVI. COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

115. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116. During the Class Period, the Individual Defendants participated in the operation and management of TMC, and conducted and participated, directly and indirectly, in the conduct of TMC's business affairs. Because of their senior positions, they knew the adverse non-public information about TMC's

misstatement of income and expenses and false financial statements.

117. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TMC's financial condition and results of operations, and to correct promptly any public statements issued by TMC which had become materially false or misleading.

118. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TMC disseminated in the marketplace during the Class Period concerning TMC's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TMC to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of TMC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TMC securities.

119. Each of the Individual Defendants, therefore, acted as a controlling person of TMC. By reason of their senior management positions and/or being directors of TMC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TMC to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of TMC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

120. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TMC.

## XVII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XVIII. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 2, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Laurence M. Rosen, Esq. (SBN 219683)
Jonathan Stern (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff and the Class*